LIGHTNING OIL COMPANY,
Petitioner,

v.

ANADARKO E&P ONSHORE, LLC
f/k/a Anadarko E&P Company,
LP, Respondent

No. 15-0910

Supreme Court of Texas.

Argued March 21, 2017

OPINION DELIVERED: May 19, 2017

Samara L. Kline, Baker Botts L.L.P., Dallas, Wade Allison, Baker Botts L.L.P., Austin, for Amicus Curiae Texas Oil and Gas Association.

Bruce K. Spindler, John W. Petry, Stephen J. Ahl, Langley & Banack, Inc., San Antonio, Lisa A. Paulson, Shannon H. Ratliff, Ratliff Law Firm PLLC, Austin, for Petitioner.

Shayne D. Moses, David A. Palmer, Moses, Palmer & Howell, L.L.P., Fort Worth, Brett David Kutnick, Deborah G. Hankinson, Rebecca Adams Cavner, Stephanie D. Nelson, Hankinson LLP, Dallas, Donato D. Ramos, Donato David Ramos Jr., Law Offices of Donato D. Ramos, PLLC, Laredo, for Respondent.

Justice Johnson delivered the opinion of the Court.

This case concerns whose permission is necessary for an oil and gas operator to drill through a mineral estate it does not own to reach minerals under an adjacent tract of land.

Anadarko E&P Onshore, LLC, entered into an oil and gas lease that restricted its use of the surface estate and required it to drill from off-site locations "when prudent and feasible." As a result, Anadarko planned to locate well sites on the surface of adjacent tracts and use horizontal drilling to produce minerals from its lease. Briscoe Ranch, Inc., owned an adjacent surface estate and agreed that Anadarko could drill from the surface of the Ranch. Lightning Oil Co., lessee of the minerals underlying the Ranch, was not a party to the agreement. Lightning sought to enjoin Anadarko from drilling on the Ranch, claiming that Lightning's consent was necessary before Anadarko could drill through the Ranch's subsurface covered by its mineral lease.

The district court dismissed the claim. The court of appeals affirmed.

We also affirm.

## I. Background

The Cutlass mineral lease encompasses the mineral estate underlying part of the Briscoe Ranch in Dimmit and LaSalle Counties. The minerals were severed from the surface estate some time ago and are owned by the Hurd Family, while Briscoe Ranch, Inc., (Briscoe) owns the surface. Lightning leased the minerals from the Hurds in 2009 and has three producing wells located on the Ranch.

The Chaparral Wildlife Management Area, a wildlife conservation area the Texas Parks and Wildlife Department (TPWD) controls, is adjacent to the Ranch.

The State of Texas owns the surface of the Chaparral and some of the minerals beneath it and Anadarko leases those minerals. The lease includes numerous restrictions on drilling activities on the surface, such as the requirement that

Drilling locations will be established off the Chaparral ... when prudent and feasible. Any drilling site locations on the [Chaparral] must be planned and authorized by [TPWD's Chaparral area] manager.

To access the minerals under the Chaparral, Anadarko entered into an agreement with the Ranch owners and developed a plan to locate at least one drilling site on the Ranch, then drill five wells from that site. The wellbores will start vertically, then "kick-off" horizontally. They will pass through portions of Lightning's mineral-bearing formations. Anadarko disclaims any intention to perforate in or produce minerals from Lightning's leasehold, and intends to comply with all applicable field rules in its operations. Anadarko says that it currently plans to build one site on the Ranch with five wells. Lightning disputes that, and contends Anadarko intends to drill sixty-five wells. But it is undisputed that all of the well sites—however many there may be—will be on the Ranch and close to the property line between the Chaparral and the Ranch.

Lightning objected to the first drilling location Anadarko staked out, so Anadarko offered to move its well site. Lightning, however, made it clear that it would object to Anadarko's drilling from any site on the Ranch, and sued Anadarko for trespass on Lightning's mineral estate and tortious interference with contract for interfering with its mineral lease. It also sought a temporary restraining order and an injunction prohibiting Anadarko from drilling on the Ranch. Shortly after Lightning sued, Anadarko and the Ranch owners en-

tered into a Surface Use and Subsurface Easement Agreement (Agreement) that specifically authorized Anadarko to locate wells on the surface, drill through the subsurface, and use the wells to produce minerals from beneath the Chaparral.

Both Lightning and Anadarko filed traditional and no-evidence motions for summary judgment. By their traditional motions, each sought partial summary judgment as to Lightning's claim for trespass on its mineral estate, claims for injunctive relief, and whether the Ranch owners could authorize Anadarko's subsurface activities absent Lightning's consent. Additionally, Anadarko challenged Lightning's tortious interference claim. In Lightning's no-evidence motion, it asserted Anadarko had no evidence to prove its affirmative justification defense to Lightning's claim for tortious interference with its lease. Anadarko's no-evidence motion also challenged Lightning's trespass and tortious interference claims.

The trial court granted Anadarko's motion for partial summary judgment, denied Lightning's motions, and pursuant to a Rule 11 agreement, severed those rulings so they could be appealed. The court did not specify the reasons for its rulings. The court of appeals affirmed. 480 S.W.3d 628, 630 (Tex. App.—San Antonio 2015). It concluded that "the surface estate owner controls the earth beneath the surface estate" and "may grant Anadarko permission to site a well on its ranch, drill down through the earth within the boundaries of the Cutlass Lease, and directionally alter its wellbore into the [Chaparral]." *Id.* at 635–36. The court explained that "absent the grant of a right to control the subterranean structures in which the oil and gas molecules are held," the mineral estate owner does not control the subsurface mass and is only entitled to "a fair chance to recover the oil and gas" from its mineral estate. *Id.* at 635 (quoting *Coastal Oil & Gas Corp. v. Garza Energy Tr.*, 268 S.W.3d 1, 15 (Tex. 2008)). It concluded that Lightning had no right to exclude Anadarko from the land masses encompassed by the Cutlass Lease. *Id.* at 636. The court determined that its conclusion necessarily meant that Anadarko prevailed on its justification defense to Lightning's tortious interference with contract claim because Anadarko was acting within its legal rights based on the Agreement. *Id.* at 637–38.

In this Court, Lightning argues that the court of appeals misapplied longstanding Texas law and relied on inapposite cases to reach its conclusion. It contends Texas law firmly establishes that the dominant mineral estate has the right to exclude those seeking to pass through it and to hold otherwise will transform the absolute ownership rights of a mineral owner or lessee in oil and gas in place into a mere license to hunt for the minerals. Lightning also argues that the court of appeals' decision greatly expands the accommodation doctrine by requiring a mineral lessee to accommodate surface uses that benefit an adjacent mineral estate. Additionally, Lightning claims that the court of appeals ignored express language in the original conveyance severing the mineral estate, which reserved to the subsurface owner the right to lease the subsurface. In light of all this, Lightning claims that the Ranch owners could not transfer to Anadarko the right to drill through Lightning's mineral estate because the Ranch owners did not possess that right. Lightning concludes Anadarko was not acting under a legal right, so it could not have established its justification defense, and Lightning was entitled to injunctive relief because Anadarko's anticipated activities on the Ranch will cause irreparable harm to Lightning's mineral estate and its lease rights.

Anadarko responds that the court of appeals correctly concluded it needed nothing more than the Ranch owners' permission to legally drill.[1] Anadarko points to authority suggesting the surface estate owner—not the mineral estate owner—controls the matrix of earth underlying the surface. This, in concert with the legal justifications underlying the rule of capture, Anadarko maintains, means Lightning does not own specific oil and gas molecules, and thus its bundle of rights as mineral lessee does not include the right to exclude pass-through drilling. Although Lightning criticizes the court of appeals' discussion of the accommodation doctrine, Anadarko discounts the court's discussion as irrelevant to the outcome, and which in any event is not an expansion of the doctrine. Finally, Anadarko argues it has established its justification defense because it has the Ranch owners' permission to enter the subsurface, which is the only permission required under the law. Anadarko prays that we affirm the judgment of the court of appeals.

## II. Standard of Review

We review grants of summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). When a trial court does not specify the grounds it relied upon in making its determination, reviewing courts must affirm summary judgment if any of the grounds asserted are meritorious. *State v. Ninety Thousand Two Hundred Thirty–Five Dollars & No Cents in U.S. Currency*, 390 S.W.3d 289, 292 (Tex. 2013). "When both parties move for summary judgment and the trial court grants one motion and denies the other, we review all the summary judgment evidence, determine all of the issues presented, and render the judgment the trial court should have." *Merriman v.*

*XTO Energy, Inc.*, 407 S.W.3d 244, 248 (Tex. 2013).

If a party moves for summary judgment on both traditional and no-evidence grounds, as the parties did here, we first consider the no-evidence motion. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the non-movant fails to overcome its no-evidence burden on any claim, we need not address the traditional motion to the extent it addresses the same claim. *See id.* To defeat a no-evidence motion, the non-movant must produce at least a scintilla of evidence raising a genuine issue of material fact as to the challenged elements. *Id.* The evidence is considered in the light most favorable to the non-movant, and every reasonable inference from the evidence is indulged in that party's favor. *Merrell Dow Pharm., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997).

A party moving for traditional summary judgment bears the burden of proving there is no genuine issue of material fact as to at least one essential element of the cause of action being asserted and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Nassar v. Liberty Mut. Fire Ins. Co.*, 508 S.W.3d 254, 257 (Tex. 2017). When reviewing a traditional motion for summary judgment, we review the evidence in the light most favorable to the non-movant, indulge every reasonable inference in favor of the non-movant, and resolve any doubts against the motion. *City of Keller v. Wilson*, 168 S.W.3d 802, 824 (Tex. 2005).

## III. Analysis

Lightning does not argue that Briscoe, as surface owner, owns and controls the subsurface of the Ranch completely subject to Lightning's lease and the dominant

---

1. The Texas Oil and Gas Association submitted an amicus brief in support of Anadarko.

nature of the lease. Rather, Lightning's claims for both trespass and tortious interference with contract turn on whether a lessee's rights in the mineral estate include the right to preclude a surface owner or an adjacent lessee's activities that are not intended to capture the lessee's minerals, but rather are intended only to traverse, or bore through, the formations in which the lessee's minerals are located. We have yet to address the question, although at least two courts of appeals have, albeit under slightly different circumstances. *See Chevron Oil Co. v. Howell*, 407 S.W.2d 525, 526–28 (Tex. Civ. App.—Dallas 1966, writ ref'd n.r.e.) (holding that the permission of the surface owner was not sufficient to afford Chevron the right to drill through the subsurface, absent permission of the mineral owner and when the surface was leased to another party who was also nonconsenting); *Humble Oil & Ref. Co. v. L & G Oil Co.*, 259 S.W.2d 933, 934–38 (Tex. Civ. App.—Austin 1953, writ ref'd n.r.e.) (denying a challenge to the Railroad Commission's authority to grant a deviated-well permit to allow a mineral lessee, that leased the minerals under a railroad right-of-way but also could not access those minerals from the right-of-way, to drill a well from the surface estate it owned despite objection from the subjacent mineral owner).

We begin by addressing the trespass cause of action.

### A. Trespass

 "Trespass to real property is an unauthorized entry upon the land of another, and may occur when one enters—or causes something to enter—another's property." *Barnes v. Mathis*, 353 S.W.3d 760, 764 (Tex. 2011). "[E]very ·unauthorized entry upon land of another is a trespass even if no damage is done or injury is slight." *Coastal Oil*, 268 S.W.3d at 12 n.36

(quoting *McDaniel Bros. v. Wilson*, 70 S.W.2d 618, 621 (Tex. Civ. App.—Beaumont 1934, writ ref'd)). The owner of realty generally "has the right to exclude all others from use of the property." *Envtl. Processing Sys., L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 424 (Tex. 2015) (quoting *Severance v. Patterson*, 370 S.W.3d 705, 709 (Tex. 2012)). But ownership of property does not necessarily include the right to exclude *every* invasion or interference based on what might, at first blush, seem to be rights attached to the ownership. *See Coastal Oil*, 268 S.W.3d at 11 ("Wheeling an airplane across the surface of one's property without permission is a trespass; flying the plane through the airspace two miles above the property is not.").

### 1. Reservoir Space

Lightning argues that the court of appeals placed too much emphasis on the surface owners' rights rather than focusing on Lightning's rights in the minerals and the reservoir space containing them. There is some merit to the argument. The court of appeals distinguished many of the cases referenced by the parties and relied primarily on three legal principles in reaching its conclusion. 480 S.W.3d at 633–35. First, the court noted that in *Humble Oil & Refining Co. v.· West* we held that the surface overlying a leased mineral estate is the surface owner's property, and those ownership rights include the geological structures beneath the surface. *Id.* at 635 (citing 508 S.W.2d 812, 815 (Tex. 1974)). Second, the court pointed to a Fifth Circuit case applying Texas law, in which that court concluded that the surface owner, and not the mineral owner, "owns all nonmineral 'molecules' of the land, i.e., the mass that undergirds the surface" estate. *Id.* (quoting *Dunn–McCampbell Royalty Interest, Inc. v. Nat'l Park Serv.*, 630 F.3d 431, 441 (5th Cir. 2011)). Third, the court

relied on our holding in *Coastal Oil*, a rule of capture case discussed more fully below, in which we held that the mineral estate owner is only entitled to "a fair chance to recover the oil and gas in place or under" the surface estate. *Id.* (citing *Coastal Oil*, 268 S.W.3d at 15).

Relying primarily on these three principles, the court of appeals concluded that Lightning does not have the right to exclude Anadarko's operations because it "does not own or exclusively control the earth surrounding any hydrocarbon molecules that may lie within the boundaries of the Cutlass Lease." 480 S.W.3d at 635. And because Lightning does not have the right to exclude, the court reasoned, Anadarko is not trespassing on Lightning's property and there is nothing to enjoin. *Id.* at 636.

■ We generally agree with the court of appeals' position regarding subsurface control. Although the surface owner retains ownership and control of the subsurface materials, a mineral lessee owns a property interest—a determinable fee—in the oil and gas in place in the subsurface materials. *Brown v. Humble Oil & Ref. Co.*, 126 Tex. 296, 83 S.W.2d 935, 940 (Tex. 1935). Lightning points out that Anadarko's drilling program will indisputably extract a portion of the subsurface roughly equivalent to the volume of the wellbore—i.e., the cuttings pushed to the surface during the drilling process—and that material will contain minerals. The drilling will also, according to Lightning, result in permanent structures in and through the subsurface that will interfere with its dom-

inant mineral estate and its exclusive right to produce the minerals.

■ Though the quantum of minerals displaced and extracted by drilling activities will be small,[2] this extraction of the mineral estate owner's interest cannot be ignored. *See Coastal Oil*, 268 S.W.3d at 12 n.36 ("[E]very unauthorized entry upon land of another is a trespass even if no damage is done or the injury is slight, and gives a cause of action to the injured party." (quoting *McDaniel Bros.*, 70 S.W.2d at 621)). Along those lines, there is a distinction between the earth *surrounding* hydrocarbons and earth *embedded* with hydrocarbons. *See West*, 508 S.W.2d at 815 (characterizing the surface owner's interest as ownership of the "reservoir storage space"). Thus, although we agree that the surface owner owns and controls the mass of earth undergirding the surface, those rights do not necessarily mean it is entitled to make physical intrusions into formations where minerals are located and remove some of the minerals—as is probable if a well is drilled into or through such formations.

The subsurface control cases relied on by the court of appeals do not definitively answer the question before us. For example, in *West*, Humble Oil obtained fee simple title to the entire estate from the Wests, who retained a royalty interest. *Id.* at 813. The Wests did not dispute Humble's ownership of the fee; rather, they argued that Humble was required to produce all recoverable native gas before injecting non-native gas into the reservoir space. *Id.* The Court's analysis focused on balancing the public policy of conserving

---

**2.** Assuming an 8 inch wellbore, the operator would need to drill roughly 1155 linear feet before displacing enough dirt to fill a standard, 15 yd$^3$ dumptruck. For context, the Escondido formation, through which Anadarko admits it will need to drill, ranges in thickness from 200–875 feet. U.S. Geologic Serv., *Mineral Resources On-Line Spatial Data: Escondido Formation*, USGS, https://mrdata.usgs.gov/geology/state/sgmc-unit.php?unit=TXKes0 (last visited Apr. 12, 2017).

natural resources and the surface owner's rights in the matrix of the earth against the royalty interest holder's rights. *Id.* at 815–16. And on balance, we concluded that the surface owner had the right to inject and store non-native gas in the formation before all of the native gas was produced. *Id.* at 817. Of particular importance is the language we used to describe the surface owner's interest in the subsurface. We reasoned that the surface owner owned "the lands in fee simple, and this includes not only the surface and mineral estates, but also the matrix of the underlying earth, *i. e., the reservoir storage space.*" *Id.* at 815 (emphasis added). The result of our decision was that the Wests' realization of their royalty interest in the native gas might be delayed or diminished without imposing liability on Humble.

Two other cases relied on by the court of appeals similarly addressed a surface owner's ownership of the subsurface mass. The court referenced one of its own cases in which it stated that "ownership of the hydrocarbons does not give the mineral owner ownership of the earth surrounding those substances." 480 S.W.3d at 635 (quoting *Springer Ranch, Ltd. v. Jones,* 421 S.W.3d 273, 283 (Tex. App.—San Antonio 2013, no pet.)). The other was *Dunn–McCampbell,* in which the Fifth Circuit was faced with determining the extent of a surface owner's control of the subsurface. *Dunn–McCampbell,* 630 F.3d at 442 (applying Texas law). The court noted that the surface owner, not the mineral owner, "owns all non-mineral 'molecules' of the land, i.e., the mass that undergirds the surface" estate. *Id.* But these cases do not determine whether the surface owner has the right to exclusive control and use of subsurface materials if they contain recoverable minerals. Thus, we are still left with the question of whether mineral owners have the right to prevent surface owners and their licensees from drilling through subsurface areas containing minerals and extracting some of those minerals during drilling operations. To answer the question we first consider the attributes of severed mineral interests.

## 2. Minerals

We have consistently recognized both "the ownership of oil and gas in place" as a property right, and the principle that a mineral lease "gives to the lessee a determinable fee therein." *Brown,* 83 S.W.2d at 940; *see also Tex. Co. v. Daugherty,* 107 Tex. 226, 176 S.W. 717, 720 (Tex. 1915). This property interest includes "the exclusive right to possess, use, and appropriate gas and oil." *Stephens Cty. v. Mid-Kan. Oil & Gas Co.,* 113 Tex. 160, 254 S.W. 290, 293 (Tex. 1923). The mineral estate is the dominant estate in the sense that the mineral owner has the right to use as much of the surface "as is reasonably necessary to produce and remove the minerals" encompassed by the lease. *Getty Oil Co. v. Jones,* 470 S.W.2d 618, 621 (Tex. 1971). The rights accruing to the dominant mineral estate are well established, but they are not absolute. *See West,* 508 S.W.2d at 815.

While the mineral estate is dominant, as explained above, the rights of a surface owner are in many ways more extensive than those of the mineral lessee. *See Coastal Oil,* 268 S.W.3d at 11 (noting that the rules for trespass are different on the surface of the earth from those that apply two miles above or below it). A property owner's rights are often described as a bundle of rights, or a bundle of sticks. And "an owner of realty has the right to exclude all others from the use of the property, one of the 'most essential sticks in the bundle of rights that are commonly characterized as property.'" *Severance,* 370 S.W.3d at 709 (quoting *Do-*

*lan v. City of Tigard,* 512 U.S. 374, 384, 393, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)). But the right to exclude is both dictated and circumscribed by the scope of an owner's rights in the property. "[P]roperty does not refer to a thing but rather to the rights between a person and a thing." *Evanston Ins. Co. v. Legacy of Life, Inc.,* 370 S.W.3d 377, 382–83 (Tex. 2012). A trespass is referred to most often, but not always, as an interference with a physical place. *See, e.g., eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 392, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006) (citing 35 U.S.C. § 261) (discussing the right to exclude under a patent). Consequently, a trespass is not just an unauthorized interference with physical property, but also is an unauthorized interference with one of the rights the property owner holds.

 When the owner of a fee simple estate severs the mineral estate by a conveyance, five rights are conveyed to the transferee or grantee: "(1) the right to develop, (2) the right to lease, (3) the right to receive bonus payments, (4) the right to receive delay rentals, and (5) the right to receive royalty payments." *Hysaw v. Dawkins,* 483 S.W.3d 1, 9 (Tex. 2016) (quoting *French v. Chevron U.S.A., Inc.,* 896 S.W.2d 795, 797 (Tex. 1995)). And an oil and gas lessee such as Lightning is generally only granted the right to develop under a lease. *See Merriman,* 407 S.W.3d at 248–49; *Stephens Cty.,* 254 S.W. at 292. This includes "the right to go onto the surface of the land to extract the minerals, as well as those incidental rights reasonably necessary for the extraction." *Merriman,* 407 S.W.3d at 248–49.

 The right to develop is a property right, *Brown,* 83 S.W.2d at 940, and has been described as "the exclusive right to possess, use, and appropriate gas and oil"; "the exclusive right to appropriate [the minerals] to any extent desired by the

grantee and his assigns"; "the exclusive right to conduct operations to mine, store, and transport [the minerals]"; and "the exclusive right to prospect for, produce, and dispose of the minerals." *Stephens Cty.,* 254 S.W. at 293–94.

#### a. Lightning's Right to Develop

 As reflected by the foregoing, the rights conveyed by a mineral lease generally encompass the rights to explore, obtain, produce, and possess the minerals subject to the lease; they do not include the right to possess the specific place or space where the minerals are located. Thus, an unauthorized interference with the *place* where the minerals are located constitutes a trespass as to the mineral estate only if the interference infringes on the mineral lessee's ability to exercise its rights.

Lightning speculates that Anadarko's proposed well sites, drilling activities, and underground well structures will interfere with both the surface and subsurface spaces necessary for it to exercise its right to develop the minerals in the future. But speculation is not enough. To obtain injunctive relief, Lightning must have proved that absent such relief, it will suffer imminent, irreparable harm. *Batnaru v. Ford Motor Co.,* 84 S.W.3d 198, 204 (Tex. 2002). It did not do so.

First, as Anadarko and the amicus point out, the Railroad Commission monitors, and has rules closely controlling, the location and number of wells that may be drilled on a tract of land. *See* 16 Tex. Admin. Code §§ 3.37–.39 (setting out spacing, well density, and proration and drilling units). All of these rules, and others, are aimed at efficiently producing minerals while minimizing waste and protecting the interests of the parties involved. *See Coastal Oil,* 268 S.W.3d at 15; *Brown,* 83 S.W.2d at 944–45. Anadarko's drilling activities

will be subject to the Commission's rules and oversight, and Lightning points to nothing that indicates the Commission will not adequately consider and protect Lightning's rights when permitting wells and fulfilling its other duties.

Second, Anadarko's rights are not any greater than those of Briscoe as surface owner. That is, Lightning's mineral estate remains the dominant estate. The accommodation doctrine has long "provided a sound and workable basis for resolving conflicts" between owners of mineral and surface estates that allows the mineral owner to use as much of the surface—and subsurface—as is reasonably necessary to recover its minerals. *Coyote Lake Ranch, LLC v. City of Lubbock*, 498 S.W.3d 53, 63 (Tex. 2016); *see Merriman*, 407 S.W.3d at 249. Lightning has advanced no reason that convinces us the doctrine will not be flexible enough to do so in the future. *See, e.g., Coyote Lake*, 498 S.W.3d at 55 (applying the accommodation doctrine, outside of the typical oil and gas application, to a dispute between a surface owner and owner of a severed groundwater estate).

### b. Minerals Lost During Drilling

 But this does not end the inquiry. Lightning argues that Anadarko is not simply interfering with the place where Lightning's minerals are found, but asserts that Anadarko is interfering with the minerals themselves by drilling through and extracting a quantum of minerals as part of that process. Lightning argues that the court of appeals' reliance on the rule of capture as to the extracted minerals was misplaced because the rule of capture is inapplicable to these factual circumstances. We agree to an extent.

 The rule of capture addresses the ownership of minerals based on their production. It vests title in whoever brings the minerals to the wellhead, even if the min-

erals flowed into the production area from outside the lease or property boundaries. *Coastal Oil*, 268 S.W.3d at 15. But this aspect of Lightning's complaint is not about producing minerals. Rather, it is that Anadarko's proposed well-drilling activities will extract minerals embedded in the physical matter that will be drilled out of the ground and removed. Whether the small amount of minerals lost through that process will support a trespass action must, in the end, be answered by balancing the interests involved, as we did in *West*. 508 S.W.2d at 816.

In balancing the relevant interests of Lightning and Anadarko, we weigh "the interests of society and the interest of the oil and gas industry as a whole against the interest of the individual operator." *Id.* With respect to Lightning's interest in preventing the destruction of its minerals, Anadarko's proposed drilling activities will inevitably remove some of the minerals Lightning holds under its lease, even though that amount will be small. The amount of minerals Lightning will lose is roughly the amount of minerals embedded in fifteen cubic yards of dirt and rock for each thousand linear feet drilled with an eight-inch wellbore. *See* n.2, *ante*. And as discussed, Lightning does not have any right to the materials surrounding any such minerals—only the minerals themselves, which will be a much smaller quantity than the mass of the materials in which they are lodged.

Despite the fact that Anadarko could reach its minerals from the surface of the Chaparral, albeit under burdensome conditions, off-lease drilling arrangements often provide the most efficient means of fully exploiting the minerals through horizontal drilling. It can take several thousand feet to kick-out and transition the roughly 90 degrees from vertical to horizontal. Christy M. Schweikhardt, Note, *Horizon-*

*tal Perspective: Texas Oil & Gas Law in Light of Horizontal Drilling Technology*, 34 S. TEX. L. REV. 329, 332 (1993). Thus, many times, when an operator drills a horizontal well from the surface under which its minerals lie, blind spots occur beneath these transition intervals that may never be fully produced unless another well is drilled to reach them. *See* Bruce M. Kramer, *Horizontal Drilling and Trespass: A Challenge to the Norms of Property and Tort Law*, 25 COLO. NAT. RESOURCES, ENERGY & ENVTL L. REV. 291, 324 (2014). By drilling from adjacent surface locations, this effect is minimized and it is less likely that additional wells will be required because the wellbore is nearly or completely horizontal when it enters the productive lease formation. *See id.* Such drilling activities allow for recovering the most minerals while drilling the fewest wells. And this Court has always viewed waste-reducing innovations favorably. *See, e.g., Coastal Oil*, 268 S.W.3d at 15–16; *West*, 508 S.W.2d at 816; *R.R. Comm'n of Tex. v. Manziel*, 361 S.W.2d 560, 568 (Tex. 1962).

Balanced against the small loss of minerals a lessee such as Lightning will suffer, if drilling through the minerals is determined to be a non-actionable interference with its property rights, is the longstanding policy of this state to encourage maximum recovery of minerals and to minimize waste. *See* TEX. CONST. art. XVI, § 59(a) ("The conservation and development of all of the natural resources of this State, ... are each and all hereby declared public rights and duties."); TEX. NAT. RES. CODE § 85.045; *West*, 508 S.W.2d at 816. In that context, we have no doubt that individual interests in the oil and gas lost through being brought to the surface as part of drilling a well are outweighed by the interests of the industry as a whole and society in maximizing oil and gas recovery. *See Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 798 (Tex. 2014) ("The

policy of Texas is to encourage the recovery of minerals, and the Legislature has made waste in the production of oil and gas unlawful."). That being so, we conclude that the loss of minerals Lightning will suffer by a well being drilled through its mineral estate is not a sufficient injury to support a claim for trespass. Accordingly, such a loss will not support injunctive relief. Lightning's claim of an impending trespass and its application for injunctive relief on that basis are rejected.

### 3. Lightning's Other Arguments

Lightning argues that allowing Anadarko's planned activities will legitimize the type of trespass we impliedly recognized in *FPL Farming Ltd. v. Environmental Processing Systems, L.C.*, 351 S.W.3d 306, 313–14 (Tex. 2011) and *Environmental Processing Systems, L.C. v. FPL Farming Ltd.*, 457 S.W.3d 414, 426 (Tex. 2015). In those cases we addressed whether a landowner could bring a trespass action against an operator who injected wastewater into a well, allegedly resulting in the wastewater migrating across the landowner's property line and contaminating the landowner's water supply. The first time we addressed the dispute in 2011, we did not reach the trespass argument, but left open the possibility of a trespass by means of migratory wastewater. *FPL Farming*, 351 S.W.3d at 313–14. When we addressed the case again in 2015, we assumed, without deciding, that a trespass cause of action for deep subsurface water migration existed and decided the case based on who had the burden of establishing lack of consent in a trespass action. *FPL Farming*, 457 S.W.3d at 418–25. Because FPL Farming did not establish that the entry was unauthorized or without its consent, we held that even if a trespass claim existed, it necessarily failed under the facts before us. *Id.* at 425. Thus, contrary to Light-

ning's assertion, we did not impliedly recognize such a claim—we simply did not address it.

■ Lightning argues that if we affirm the court of appeals' judgment we will depreciate the mineral estate's dominance and impair Lightning's right to use as much of the surface as is reasonably necessary to produce its minerals. We disagree. As noted above, Anadarko's rights extend only as far as those held by the owners of the surface estate. Lightning's mineral estate remains the dominant estate regarding use of the surface—and subsurface—for development of its mineral estate. *See Coyote Lake*, 498 S.W.3d at 60 ("In the law of servitudes, the mineral estate is called 'dominant' and the surface estate 'servient', not because the mineral estate is in some sense superior, but because it receives the benefit of the implied right of use of the surface estate."); *see also Merriman*, 407 S.W.3d at 249; *Acker v. Guinn*, 464 S.W.2d 348, 352 (Tex. 1971). Lightning's argument is essentially that it should have the right to prevent any surface or subsurface use that might later interfere with its plans. Such a decision would render the mineral estate absolutely dominant and significantly alter the balance achieved through the flexible nature of the accommodation doctrine. *See, e.g., Jones*, 470 S.W.2d at 623 (providing surface owner relief when lessee's pumping units prevented use of pivot irrigation because lessee had readily available reasonable alternative to produce its minerals). We decline the invitation to alter oil and gas law in such a drastic manner.

■ Lightning next argues that if we affirm the judgment of the court of appeals, the mineral estate's dominant nature will be diluted because mineral owners and lessees will have to allow uses of the mineral estate to benefit adjacent estates. Along those lines, Lightning argues that the court of appeals has expanded the accommodation doctrine to benefit a second, adjacent, mineral owner such as Anadarko by requiring the owner of minerals in a tract such as Lightning to accommodate the surface owner's economic endeavors. But because Anadarko is the surface owner's assignee, its activities are a surface use for accommodation doctrine purposes. That is, Lightning's mineral estate remains dominant and the surface estate remains servient insofar as Lightning's activities are reasonably necessary to develop and recover its minerals. *See Merriman*, 407 S.W.3d at 248–49. Anadarko's status as it relates to Lightning is derived from the bargain it made with the Ranch's surface owners, not its status as adjacent mineral lessee. We reject Lightning's argument.

■ Lightning argues also that Briscoe did not have the right to authorize Anadarko's proposed drilling activities because that right was reserved to the Hurds—Lightning's lessor—in the deed transferring the surface to Briscoe's predecessor-in-interest. That deed provides that the Hurds would retain "the sole and exclusive right *to lease said property for oil, gas and mineral purposes.*" (emphasis added). As we have already mentioned, a severed mineral estate has five essential attributes: "(1) the right to develop, (2) the right to lease, (3) the right to receive bonus payments, (4) the right to receive delay rentals, and (5) the right to receive royalty payments." *Hysaw*, 483 S.W.3d at 9 (quoting *French*, 896 S.W.2d at 797). Looking to the other language in this deed, it is clear that the language Lightning references effectuates only the grantor's reservation of the executive right to lease the minerals. The language does not dictate the result Lightning seeks; our discussion above turns on Lightning's right to develop its mineral interest and the scope

of its right to exclude Anadarko under that right. The deed language concerning the executive right to lease the minerals is insufficient to reserve control of the surface rights to the Hurds as mineral owners, except to the extent it might be reasonably necessary to use the surface (and subsurface) to develop and produce minerals. *See Merriman,* 407 S.W.3d at 248–49.

Finally, we note it is irrelevant that there are existing wells on the Chaparral or that there might be surface locations on other property adjacent to the Chaparral where Anadarko could site its wells. Our decision is not based on necessity, but on the respective rights of the surface estate and the mineral estate. Further, the number of wells a pass-through driller might drill is not relevant with respect to claims in trespass against that driller. Thus, even though the exact number of wells Anadarko plans to drill is disputed, that dispute does not affect our disposition of the trespass issue.

We affirm the court of appeals' judgment regarding the trespass issue.

### B. Tortious Interference with Contract

Lightning argues that the court of appeals incorrectly determined that Lightning's tortious interference with contract claim fails because Anadarko has the legal right to do what it plans to do.

Tortious interference with a contract occurs when a party interferes with a contract willfully and intentionally and the interference proximately causes actual damages or loss. *See Murray v. Crest Constr., Inc.,* 900 S.W.2d 342, 344 (Tex. 1995). Justification is an affirmative defense to such a claim and "is established as a matter of law when the acts the plaintiff complains of as tortious interference are merely the defendant's exercise of its own contractual rights." *Prudential*

*Ins. Co. of Am. v. Fin. Review Servs., Inc.,* 29 S.W.3d 74, 81 (Tex. 2000).

Lightning does not contend that the Agreement failed to grant Anadarko consent to drill on the Ranch. Anadarko was exercising its rights under the Agreement when it prepared to drill on the Ranch, and so far as this record shows, its drilling plans were within the rights granted in the Agreement and did not tortiously interfere with Lightning's contractual lease rights.

Accordingly, we agree with the court of appeals that Anadarko was entitled to summary judgment on the tortious interference with contract claim.

### IV. Conclusion

The judgment of the court of appeals is affirmed.