

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-17-00396-CV

OLIVER COMMUNICATIONS GROUP, INC., APPELLANT

V.

SCHNEIDER ELECTRIC BUILDINGS AMERICAS, INC., APPELLEE

On Appeal from the 96th District Court
Tarrant County, Texas
Trial Court No. 096-276,107-14, Honorable R. H. Wallace, Jr., Presiding

November 2, 2018

## MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and PARKER, JJ.

Oliver Communications Group, Inc. (Oliver) appeals from a final summary judgment.[1] It had been sued by Schneider Electric Buildings Americas, Inc. (Schneider) for indemnity per a subcontract executed between Oliver and Schneider (Subcontract). According to the record, Schneider contracted with the Delaware River Port Authority of Pennsylvania (Port Authority) to install security cameras on the Benjamin Franklin Bridge (Bridge Contract). A provision of the Bridge Contract allegedly obligated Schneider to indemnify Port Authority against certain claims. Schneider and Oliver executed the

---

[1] Because this appeal was transferred from the Second Court of Appeals, we are obligated to apply its precedent when available in the event of a conflict between the precedents of that court and this Court. *See* TEX. R. APP. P. 41.3.

Subcontract to facilitate completion of Schneider's agreement with Port Authority. In the Subcontract, Oliver also agreed to indemnify Schneider against certain claims.

Once performance under these contracts began, an employee of Oliver (i.e., Patrick Burness) slipped and fell on steps at the job site. Burness sued Port Authority, among others. Port Authority demanded indemnification from Schneider, and, in turn, Schneider demanded indemnification from Oliver. Oliver refused, while Schneider did not. Eventually, Burness settled his lawsuit, Schneider paid the settlement, and Schneider sued Oliver for indemnification upon the Subcontract. Thereafter, both litigants filed their respective motions for summary judgment. The trial court granted that of Schneider while denying Oliver's. Thus, Schneider was awarded over $1.2 million against Oliver.

Oliver appealed, contending that the trial court erred in granting Schneider's motion for summary judgment and denying its own. Though Oliver lay a number of issues and sub-issues before us, they primarily involve the existence of an agreement obligating it to indemnify Schneider, the enforceability of any such indemnity agreement, and whether Oliver was obligated to pay pre-judgment interest on attorney's fees. We reverse and render.

*Authority*

We review traditional and no-evidence motions for summary judgment under the standards discussed by the Supreme Court in *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614 (Tex. 2018), and *Lightning Oil Co. v. Anadarko E&P Onshore, LLP*, 520 S.W.3d 39 (Tex. 2017). Those standards are applied here.

Next, Oliver and Schneider seem to agree that the rules of contract interpretation of both Pennsylvania and Texas control. Both sets of rules require us to interpret the

2

meaning of a contract by focusing on the intent of the parties as evinced by the words used in the instrument.  *See Mace v. Atl. Ref. & Mktg. Corp.*, 785 A.2d 491, 496 (Pa. 2001) (stating that a fundamental rule in construing a contract is to ascertain and give effect to the intent of the contracting parties and, when the words of a contract are clear and unambiguous, the meaning of the contract is ascertained from the contents of the agreement alone); *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763–64 (Tex. 2018) (stating that our objective is to ascertain and effectuate the parties' intent as expressed in the instrument and interpret contract language according to its plain, ordinary, and generally accepted meaning unless the instrument directs otherwise).  Furthermore, the words are not construed in isolation but, rather, in context with the entirety of the agreement.  *URI, Inc.*, 543 S.W.3d at 764.

Next, it is argued here that Port Authority sought indemnity against its own negligence.  That calls into play another rule of construction utilized in both Pennsylvania and Texas.  Per its edict, an indemnity contract should not be construed so as to indemnify against the negligence of the indemnitee unless it is so expressed in unequivocal terms. *Mace*, 785 A.2d at 495; *accord Fisk Elec. Co. v. Contractors & Assocs., Inc,* 888 S.W.2d 813, 814–15 (Tex. 1994) (stating that indemnity provisions which do not clearly provide for indemnification for the indemnitee's own negligence do not, as a matter of law, indemnify the indemnitee for its own negligence).

Texas authority also mandates that indemnity agreements are strictly construed in favor of the indemnitor.  *Yowell v. Granite Oper. Co.*, __S.W.3d__, __, 2018 Tex. App. LEXIS 5820, at *25 (Tex. App.—Amarillo July 26, 2018, pet. filed); *Levco Constr., Inc. v. Whole Foods Mkt. Rocky Mountain/Sw. L.P.*, 549 S.W.3d 618, 648 (Tex. App.—Houston [1st Dist.] 2017, no pet.); *Irvin v. Guarantee Co. of N. Am.*, No. 05-07-01230-CV, 2008

Tex. App. LEXIS 5865, at *9 (Tex. App.—Dallas Aug. 5, 2008, no pet.) (mem. op.); *accord Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 707 (Tex. 1987) (stating that "[a]n examination of cases from this court reveals its trend toward more strict construction of indemnity contracts"). This rule requiring strict construction favoring the indemnitor bars the extension, by construction or implication, of the indemnitor's duty beyond the precise terms of the agreement. *Irvin,* 2008 Tex. App. LEXIS 5865, at *9. This is not a rule of construction but, rather, a rule of substantive law that applies only after the parties' intent has been ascertained through ordinary rules of construction. *Id.* at *9–10.

*Issue One – Schneider's Motion for Summary Judgment – Duty to Indemnify*

Oliver initially contends that it had no agreement to indemnify Schneider for indemnifying Port Authority. This was purportedly so because Oliver had no agreement with Port Authority, and though Schneider did, Schneider failed to prove that it "was contractually bound to indemnify [Port Authority] in connection with the underlying suit" of Burness. We sustain the issue.

The claims of indemnification here are founded upon contract. So, resolution of Oliver's contentions necessarily entails linking Oliver to Port Authority. That is, Oliver must have agreed to indemnify Schneider for indemnifying Port Authority. Furthermore, both indemnity agreements somehow must have encompassed the claim urged by Burness against Port Authority. The burden to establish that link lay upon Schneider since it sought to impose liability upon Oliver via traditional motion for summary judgment. *See Lightning Oil Co.,* 520 S.W.3d at 45 (stating that the movant in a traditional motion for summary judgment has the burden to prove its entitlement to judgment as a matter of law). Whether it satisfied that burden requires us to look at the various agreements executed by the litigants.

4

We begin with the agreements between Port Authority and Schneider. That relationship started with a "Request for Proposal" and culminated in a "Purchase Order." The former consisted of multiple sections, including the "project description," "proposal requirements," and "general provisions." Within the "general provisions" lay the indemnity clause obligating the "Design/Builder" to indemnify Port Authority against claims

> arising out of or resulting from: (a) performance or non-performance of the Work; (b) breach of any of the Design/Builder's obligations under the Contract Documents, or (c) acts or omissions of the Design/Builder, its contractors, consultants, suppliers, or anyone directly or indirectly employed by any of them or anyone for whose acts they may be responsible, regardless of whether or not such claim, demand, cause of action, damage, liability, loss, or expense is caused in part by a party indemnified hereunder.

The "Purchase Order" issued by the Bureau of Financial Management, apparently on behalf of Port Authority, identified Schneider[2] as the "supplier" and noted that it was issued on "07/18/2008." Though unsigned, it not only described the materials and services to be provided but also incorporated by reference various extraneous documents. The passage incorporating those documents provided that "[t]his Purchase Order is comprised of: The above-referenced Solicitation, the Supplier's Bid or Proposal, and any documents attached to this Purchase Order or incorporated by reference." The "Purchase Order" we have of record has no "documents attached." Nor does it contain the "Supplier's Bid or Proposal." And, in perusing its content, we found no "Solicitation" purporting to be referenced above. Nor did we find any reference to the aforementioned "Request for Proposal" or provision expressly incorporating that "Request" into the "Purchase Order." Moreover, the "Purchase Order" itself contained no indemnity provision.

---

[2] The actual "supplier" was a predecessor of Schneider. We refer to it as Schneider for mere simplicity.

5

As for the existence of a separate, signed master contract between Port Authority and Schneider supplementing or incorporating the "Purchase Order" or otherwise clarifying the extent of their respective obligations, evidence of record indicates that there was none. Therein lies the basis for Oliver's initial complaint, as we will explain. Before we do so, however, it is first appropriate to continue our sojourn down the rabbit hole by discussing the various documents manifesting the contract between Schneider and Oliver.

We begin with the "Subcontract for Construction" (Subcontract) signed by Oliver and Schneider apparently on July 18, 2008. It denominated Schneider as "Contractor" and Oliver as "Subcontractor." So too did it name the "Commonwealth of Pennsylvania" as the "customer" and incorporated by reference the "Master Agreement . . . dated July 2, 2008," between Schneider and Oliver. Paragraph 4 of the Subcontract also stated that "[t]he Contract Documents for this Subcontract Agreement are enumerated in Attachment '1.'"

In turn, Attachment "1" itemized the "Contract Documents" as follows: 1) "this Agreement (Subcontract No. T1154E . . . and Master Agreement . . . including all exhibits and attachments, the Contract between the Contractor and the Commonwealth of [Pennsylvania] hereinafter referred to as Contractor's Contract, and all Contract Documents identified therein; the drawings, plans, and specifications, [and] all addenda . . ."; 2) "[t]his Attachment '1'"; 3) "Schedule of Values"; 4) "Subcontractor's Partial Lien Release"; 5) "Affidavit and Conditional Lien Waiver"; 6) "Scope of Work"; 7) "Terms and Conditions of the Master Agreement"; and 8) various other writings not pertinent here.

The Master Agreement contains the provision obligating Oliver to indemnify Schneider. That provision states as follows:

TO THE FULLEST EXTENT PERMITTED BY LAW WITH RESPECT TO THE WORK COVERED BY THIS SUBCONTRACT, SUBCONTRACTOR AGREES TO INDEMNIFY, SAVE AND HOLD HARMLESS THE CONTRACTOR, CONTRACTOR'S AGENTS AND EMPLOYEES, AND ALL PARTIES INDEMNIFIED BY CONTRACTOR IN CONTRACTOR'S CONTRACT FROM AND AGAINST ALL CLAIMS, DAMAGES, LOSSES AND EXPENSES INCLUDING, REASONABLE ATTORNEY'S FEES . . . ARISING BY REASON OF THE DEATH OR BODILY INJURY TO PERSONS, INJURY OR DAMAGE TO PROPERTY, DESIGN DEFECTS . . . DESTRUCTION OF TANGIBLE PROPERTY OR THE USE THEREOF, TO THE EXTENT CAUSED IN WHOLE OR IN PART BY ANY NEGLIGENT ACT OR OMISSION OF SUBCONTRACTOR, SUBCONTACTOR'S EMPLOYIEES, AGENTS, SUPPLIERS, SUBCONTRACTORS OR ANYONE FOR WHOSE ACTS SUBCONTRACTOR MAY BE LIABLE AND SUBCONTRACTOR EXPRESSLY SO AGREES, WHETHER OR NOT SAID LIABILITY, CLAIM, DEMAND, LOSS OR EXPENSE ARISES IN PART FROM THE NEGLIGENCE OF CONTRACTOR OR ANY PARTY INDEMNIFIED BY CONTRACTOR IN CONTRACTOR'S CONTRACT . . . .

One other provision in the Master Agreement merits note. It is found in Article 14 of the accord and provides that "[t]his Agreement shall be [i]nterpreted and enforced according to the laws of the State of Texas." Thus, Pennsylvania authority does not regulate application or interpretation of the agreement between Oliver and Schneider.

As can be seen from the aforementioned indemnity provision, those encompassed within Oliver's duty to indemnify included the Contractor (Schneider) and its employees and agents as well as "all parties" that Schneider "indemnified . . . in the Contractor's Contract." Per Attachment "1" to the Subcontract, the "Contractor's Contract" refers to the contract between the Commonwealth of Pennsylvania and Schneider wherein Schneider obligated itself to indemnify Pennsylvania. Apparently, Oliver asked for a copy of that "Contractor's Contract" and was told that none existed. Instead, there was "just a Purchase Order from PEMA." That "Purchase Order" contained no indemnity provision,

7

as we previously observed. Again, the only indemnity provision between Schneider and Port Authority is found within the "Request for Proposal" wherein the "Design/Builder" acceded to provide indemnification.

Assuming *arguendo* that Schneider was the "Design/Builder" alluded to in the "Request for Proposal," the latter document was not expressly referenced in or expressly incorporated into the only agreement between Schneider and Port Authority, i.e., the "Purchase Order." Admittedly, the latter alludes to an "above-referenced Solicitation" but again, the "Purchase Order" does not mention any "Solicitation." Nor did the "Purchase Order" define what was meant by "Solicitation." Whether the "Solicitation" and March 2008 "Request for Proposal" are one and the same is left to conjecture. And, the burden fell upon Schneider to establish that connection, if any, via its traditional summary judgment evidence.

So, the record at bar falls short of linking Oliver to Port Authority. Oliver is linked to Schneider and anyone Schneider contracted to indemnify. But, no agreement we encountered of record completes the chain by establishing, as a matter of law, that Schneider agreed to indemnify Port Authority, Pennsylvania, or any Pennsylvania entity.[3] Thus, Schneider failed to prove, as a matter of law, that it was contractually obligated to indemnify Port Authority. And, if it was not, then Oliver's duty to indemnify was never triggered. So, Schneider was not entitled to summary judgment.

---

[3] Schneider suggests otherwise by referring to a "Master Agreement" "between Schneider and DRPA/PATCO [i.e., Port Authority]." That agreement purportedly contained or incorporated exhibits and attachments included in the "Request for Proposal." Yet, the page citations it afforded us do not support its proposition. Rather, the documents found on pages 135 and 137 of the Clerk's Record refer to a master agreement between Schneider and Oliver. For instance, that on page 135 concerns a "Master Agreement No. PHI000110, dated 7/2/2008 **between Oliver Communications & Group and TAC Americas, Inc.** [i.e., Schneider]" while that on page 137 involves the same "Master Agreement No. PHI000110, dated 7/2/2008." (Emphasis added). *See also* I C.R. 144–59 (the Schneider/Oliver "Master Agreement" numbering and dating itself PHI000110 and July 2, 2008, respectively).

We find another issue precluding summary judgment. It pertains to the scope of Oliver's duty as specified in the Master Agreement. Therein, Oliver agreed to indemnify against claims "arising by reason of the death or bodily injury . . . to the extent caused in whole or in part by any negligent act or omission of Subcontractor [Oliver], [Oliver's] employees, agents, suppliers, subcontractors or anyone for whose acts subcontractor may be liable and [Oliver] expressly so agrees, whether or not said liability . . . arises in part from the negligence of Contractor [Schneider] or any party indemnified by [Schneider] in Contractor's Contract." Per *URI, Inc.*, the components of this clause may not be construed in isolation but in the context of the entire agreement. And, per *Ethyl* and *Yowell*, we must also strictly interpret them in a manner favoring the indemnitor, i.e., Oliver. Following those rules leads us to these observations.

The first concerns who "caused" the death, injury, or damage; it is death, injury, or damage "caused in whole or part" by "any negligent act or omission" of a specifically denominated group of individuals or entities. That specifically denominated group is Oliver and its "employees, agents, suppliers, subcontractors, or anyone for whose acts [Oliver] may be liable." Additionally, the conduct in which they engaged must be negligent. A non-negligent act or omission on their part falls outside the phrase's scope. Following that comes verbiage explaining a lack of limitation upon the breadth of Oliver's "liability." The language to which we refer is that saying the indemnitor agreed to be responsible for the negligence of its employees, agents, suppliers, subcontractors, and the like "whether or not said liability . . . arises in part from" Schneider's negligence or the negligence of anyone Schneider agreed to indemnify in its contract with Port Authority.

When we put the two components of the clause together, we read the provision as meaning that Oliver will be liable for injury, death, and damage caused by the negligence

9

of the specifically named group even if the negligence of Schneider or its indemnitees partially caused the same injury, death, or damage. In other words, Schneider and its indemnitees cannot be the sole cause of the injury, for the injury must also be caused in part by someone or some entity within the specifically named group. Simply put, the clause speaks of a potential for multiple causes. Of those multiple causes, one must be the negligent actions or omissions of Oliver, its employees, agents, subcontractors, suppliers, or entities for which Oliver is liable. Indeed, our interpretation of that clause finds support in authority from sister courts construing relatively similar indemnity provisions.

For instance, in *Delta Airlines, Inc. v. ARC Sec., Inc.*, 164 S.W.3d 666 (Tex. App.—Fort Worth 2005, pet. denied), the Fort Worth Court of Appeals had opportunity to interpret a clause stating as follows: "Contractor [ARC] shall indemnify, defend and hold harmless Delta . . . from and against any and all claims . . . which in any way arise out of or result from any act(s) or omission(s) by [ARC]" and "[t]his section shall apply regardless of whether or not the damage, loss or injury complained of arises out of or relates to the negligence . . . of, or was caused in part by, a party indemnified hereunder." *Id.* at 669.[4] The summary judgment evidence there indicated that the claims involved did not arise or result from anything ARC or its employees did. So, the issue became whether ARC's duty to indemnify encompassed claims arising from Delta's sole negligence. *See id.* at 671.

---

[4] Again, this case was transferred from the Fort Worth Court of Appeals, and we are bound to follow its precedent in the event of a conflict. *See* TEX. R. APP. P. 41.3. While we do not observe a conflict between this Court and our sister court, we find *Delta Airlines* particularly persuasive as it represents relevant authority from the transferor court.

The majority analyzed the two components of the clause by comparing them and their purpose. According to it, the first sentence "define[d] the indemnity obligation, and the second define[d] its parameters." *Id.* at 672. The "first sentence . . . [said] that ARC will indemnify Delta against all claims against Delta *that arise out of acts or omissions of ARC under the Agreement.*" *Id.* The second said "that this indemnification by ARC will be applicable notwithstanding the negligence of a party indemnified under it, which is Delta." *Id.* "In other words, ARC's obligation to indemnify Delta, *if Delta is sued for ARC's acts or omissions* exists even if Delta is also negligent, or loss was 'caused in part by' Delta." *Id.* Yet, "nowhere is there language that directly or indirectly [said] that ARC will indemnify Delta if Delta is solely at fault, because if Delta is solely at fault, then ARC cannot be at fault and Delta could not be sued for ARC's acts or omissions as required for indemnification." *Id.* at 672–73. In short, the *Delta* panel required the involvement of some act or omission on the part of ARC to trigger the duty to indemnify. The negligence of Delta alone was not enough, given the wording of the provision; so, the clause did not obligate ARC to indemnify against Delta's sole negligence. *See id.*

Admittedly, there was a concurrence. Nonetheless, Justice Gardner still read the two sentences as requiring that the claim arise from ARC's acts or omission. In her view, "ARC's indemnity obligation would still only be triggered by allegations in the underlying suit that the claimed injuries arose out of performance or nonperformance of ARC's services." *Id.* at 675 (Gardner, J., concurring).

So, both the majority and concurrence in *Delta* interpreted the clause as obligating ARC to indemnify Delta for claims arising from a certain category of conduct, that conduct being the acts or omissions of ARC. Components of the clause at bar require the same. The first phrase defines the category of claims subject to indemnification, those being the

11

negligent acts of Oliver, its employees, agents, suppliers, subcontractors, or those for whom Oliver may be liable. The phrase following that (i.e., "whether or not said liability . . . arises in part from the negligence of . . .") simply clarifies that Oliver will remain obligated to indemnify against the acts of its employees, agents, *et al.* even if the negligent acts of Schneider or an entity that Schneider is contractually obligated to indemnify were partly involved. And, just as ARC did not do in *Delta*, given the wording of the indemnity provision there, Oliver did not agree to indemnify Schneider or Port Authority if either entity's sole negligence caused the injury, given the strictly construed wording of the provision here.

Our construction of the clause finds additional support in *Tri-State Ins. Co. v. Rogers-O'Brien Constr. Co.*, No. 05-95-01639-CV, 1997 Tex. App. LEXIS 2302 (Tex. App.—Dallas Apr. 30, 1997, writ denied) (mem. op.). There, Tri-State sought a declaratory judgment adjudicating whether an insurance policy issued to Ellsworth covered the claim of an Ellsworth employee who sued Ellsworth and Rogers-O'Brien for injuries incurred on the job. *Id.* at *2. Ellsworth was a subcontractor of Rogers-O'Brien working on a construction project for Rogers-O'Brien. Furthermore, Rogers-O'Brien sought indemnity from Ellsworth per a clause of the subcontract. *Id.* The indemnity provision in question stated that, "[t]o the fullest extent permitted by law, [Ellsworth] shall defend, indemnify and hold harmless . . . [Rogers-O'Brien] . . . from and against all claims . . . arising out of or resulting from the performance of [Ellsworth's] work under the subcontract . . . to the extent caused in whole or in part by any negligent act or omission of [Ellsworth] or anyone directly or indirectly employed by him or anyone for whose acts he may be liable, regardless of whether it is caused in part by the negligence of . . .

12

[Rogers-O'Brien].'" *Id.* at *3–4. Rogers-O'Brien argued that this provision satisfied the express negligence doctrine. *Id.* at *5–6.

The reviewing court disagreed and concluded that "Ellsworth never agreed to indemnify Rogers-O'Brien for Rogers-O'Brien's negligence." *Id.* at *14. "When the parties used the limiting language 'to the extent caused in whole or in part by any negligent act or omission of [Ellsworth],' they left no doubt as to their intention to indemnify Rogers-O'Brien against **only** Ellsworth's negligent acts." *Id.* (Emphasis added). "The expression 'to the extent' means specifically that Rogers-O'Brien should be indemnified in an amount equivalent to the proportion Ellsworth's negligent acts bear to the whole of the acts or omissions that caused [the employee]'s injuries." *Id.* The remaining language, "'regardless of whether it is caused in part by the negligence of [Rogers-O'Brien][,]' does not unequivocally indicate the specific intent [required by the express negligence doctrine] that Ellsworth would indemnify Rogers-O'Brien for Rogers-O'Brien's negligence." *Id.* The same is no less true here. The phrase "whether or not said liability . . . arises in part from the negligence of" Schneider or those it agreed to indemnify again merely means that Oliver will indemnify Schneider for the negligence of Oliver's employees, agents, *et al.* even if the negligence of Schneider or anyone Schneider agreed to indemnify was partly involved.

So, before it was entitled to summary judgment, Schneider had to present evidence establishing, as a matter of law, that Burness's injuries were proximately caused, at least in part, by the negligence of Oliver or its employees, agents, *et al.* Whether it did requires us to return to the summary judgment record. It illustrates that Burness sued Port Authority and other governmental entities for his injuries. He alleged that they were incurred while performing employment duties and walking down

13

deteriorating steps that the defendant governmental entities were obligated to maintain. His accusations did not assign any negligence to Oliver, its employees, agents, suppliers, subcontractors, or entities for which Oliver may be liable. Only the negligence of Port Authority and the other named governmental entities caused his injuries, according to his pleading.

As for any proof that Oliver or any of its employees, agents, et al. were negligent, we found reference to three bits of evidence. They concerned Burness. The first two were opinions voiced by the same attorney. The one appearing in his affidavit consisted of the opinion that, "based on my experience, I believed the jury would find some percentage of negligence on Mr. Burness, but the most we could have hoped for was contributory negligence in the range of 10%." The other, which appeared in an unsworn declaration, consisted of the following statement: "Based on my experience, a negligence finding on Mr. Burness could be in the range of 10%."[5] Accompanying neither opinion were facts illustrating the basis for the statement or describing the conduct in which Burness engaged at the time and explaining why it was purportedly negligent. As such, the opinions were conclusory and, therefore, incompetent summary judgment evidence. In other words, they are no evidence of negligence on the part of Burness. *See Rider v. 21st Mortg. Corp.*, No. 02-17-00354-CV, 2018 Tex. App. LEXIS 3919, at *8 (Tex. App.— Fort Worth May 31, 2018, no pet.) (mem. op.) (holding that because putative husband did not provide the underlying facts to support his assertion that he and another person were informally married, his assertion was conclusory and not competent summary judgment

---

[5] These opinions apparently were voiced in effort to establish the reasonableness of the settlement Port Authority reached with Burness.

evidence); *Nelson v. Martinez*, No. 07-15-00430-CV, 2016 Tex. App. LEXIS 7421, at *23 (Tex. App.—Amarillo July 12, 2016, pet. denied) (mem. op.) (holding the same).

As for the third bit, it concerns a deposition excerpt wherein the deponent purportedly "testified that there was an unsafe condition in the area of Burness' fall 'depending on' whether the person using it was using the handrail." The deponent was being asked about whether the steps were in an "unsafe condition." Her response was: "It can be if someone is not – there's handrails along, if I remember correctly, these stairwells. As I remember, we extended the handrails so that someone could have a grip on it years ago. So, it can be unsafe. It depends on the person's footing, as to how much more or less safe it would be to use the stair, I would say." She was then asked what she meant by "more or less" to which question, the deponent replied: "Because the – I am seeing that the stair landing, itself, the tread, would be enough to support a foot, and then again, with hand rails, depending on how someone is walking down . . . and when you have footing on these stairs, because there is enough of a tread to have footing, then one could navigate the stair." The context of these statements evince that the deponent was not discussing the supposed negligence of Burness but, rather, the unsafe condition of the stairs. She admitted that they were unsafe depending on how one walked down them. She did not describe how Burness walked down them or how one utilizing them to install security measures on a bridge construction project should use them. Neither did she suggest that Burness was not using the handrails or that a reasonable person performing the duties Burness was performing at the time would or could have used the handrails. Instead, she merely opined that "one could navigate the stair" giving the footing size and handrail presence. Whether being able to "navigate" a deteriorating stair by using a handrail amounts to a safe condition is not something we need address; nor is it

15

something that the deponent concluded. Such, though, is not evidence that Burness breached a duty of care that proximately caused his injuries.[6]

In sum, Oliver agreed to indemnify others from the negligence of its own employees, agents, suppliers, and the like. It did not agree to indemnify either Schneider or Schneider's purported indemnitees against the negligence of Schneider or Schneider's indemnitees. Furthermore, the evidence of record to which we were cited falls short of raising a question of fact regarding whether the injuries suffered by Burness were caused by his own negligence or any other employee, agent, supplier, or subcontractor of Oliver or entity for which Oliver may be liable. This again means that the trial court erred in entering the summary judgment it entered.

*Issue Two – Oliver's Motion for Summary Judgment*

Oliver asks that the summary judgment order be reversed and that we "render a take-nothing judgment in favor of Oliver, pursuant to its cross-motion." In the alternative, it wanted us to reverse and remand the cause for further proceedings. The cross-motion to which it referred was a traditional and no-evidence motion for summary judgment. Additionally, the grounds upon which both were sought included the arguments that 1) Schneider's decision to indemnify Port Authority was gratuitous since the former had no contractual obligation to indemnify the latter and 2) there was no evidence that Burness was negligent.

---

[6] We do not ignore Schneider's contention that Pennsylvania law "provides that the failure to use an available handrail can constitute contributory negligence in a claim regarding a fall." That failing to use a handrail under a particular set of facts may constitute negligence does not mean it is negligence in all situations or in situations in which Burness or like workers found themselves. Not even the authority it cited in support of the contention, *see, e.g.*, *Stevenson v. Pittsburg, C. C. & St. L. Ry.,* 219 Pa. 626 (1907) (icy steps of which plaintiff knew and evidence of no reason to forgo use of handrail), or *Ward v. Horn & Hardart Baking Co.*, 62 A.2d 97 (Pa. Superior 1948) (presence of mud and slush at entry of which plaintiff knew and evidence of no reason to forgo use of handrail), so hold.

As discussed above, the evidence of record failed to link Oliver to Port Authority for purposes of indemnification.  Nor did it contain evidence that Burness was negligent and that his negligence proximately caused any of his injuries.  By raising the matter via a no-evidence motion for summary judgment, Oliver placed the burden on Schneider to provide such evidence.  Because it did not, Oliver was entitled to summary judgment on at least two grounds encompassed within its no-evidence cross-motion.  Being so entitled, we need not address the other issues it raised on appeal.

We reverse the final summary judgment of the trial court and render judgment denying Schneider recovery against Oliver.

Brian Quinn
Chief Justice