**Opinion issued March 31, 2022**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-20-00191-CV

————————————

**UV LOGISTICS, LLC D/B/A UNITED VISION LOGISTICS, Appellant**

**V.**

**JAMES MARK PATSFIELD, III, Appellee**

---

**On Appeal from the 295th District Court**
**Harris County, Texas**
**Trial Court Case No. 2015-69907**

---

## MEMORANDUM OPINION

UV Logistics is an oil and gas trucking company. James Patsfield entered into a contract with UV Logistics in 2012 to operate a trucking terminal through which UV Logistics would move its customers' freight to and from a large oil and gas site in Pennsylvania. UV Logistics terminated the contract in 2015, and

Patsfield sued under various causes of action. A jury found for Patsfield on one theory: fraudulent inducement to remain in the UV Logistics contract. The jury awarded Patsfield $450,000 in damages.

In its first appellate issue, UV Logistics contends that there is no cause of action for fraudulent inducement to continue performing under a contract and, even if there were, Patsfield presented legally and factually insufficient evidence to support the liability and damages findings. In its second issue, it contends that the trial court abused its discretion in allowing Patsfield's damages expert to testify because his opinions were speculative and contrary to the facts and contract terms. UV Logistics argues alternatively, in its third issue, that the Court should suggest a remittitur of damages.

Patsfield presents five cross-issues. In his first issue, he contends that UV Logistics failed to preserve error on the submission of the claim for fraudulent inducement to continue performance. In his second issue, he contends that UV Logistics waived its challenge to his damages expert's testimony. In his last three issues, he challenges the trial court's ruling on UV Logistics's motion for summary judgment that successfully removed several causes of action from the jury's consideration.

Concluding that there was legally insufficient evidence to support the jury's verdict against UV Logistics and that the trial court did not err in its pretrial grant of summary judgment to UV Logistics on the other causes of action, we reverse.

**Background**

UV Logistics is a trucking company. It specializes in carrying oil and gas freight—such as pumps, drills, and pipes—for companies like Halliburton, Schlumberger, and Baker Hughes. UV Logistics uses thousands of trucks to service its customers. The trucks are coordinated through two types of terminals. The first type is a UV Logistics-operated terminal, referred to in the industry as a company store. The second type is an independent terminal run by an independent contractor who is paid commissions for soliciting truck operators to lease their equipment to UV Logistics and is paid commissions on the individual freight deliveries.

UV Logistics entered into an Independent Terminal Operator Agreement with James Patsfield in September 2012. Patsfield's terminal would be located in Pennsylvania near an active oil and gas site. Patsfield would solicit truck owners to lease their equipment to UV Logistics so that their trucks (and truck drivers) could haul UV Logistics's customers' freight. Patsfield would act as an agent of UV Logistics in dealing with the truck owner-operators and coordinate freight hauls.

3

The ITOA was a non-exclusive agreement. UV Logistics did not commit to a minimum use of Patsfield's services and reserved the right to "solicit or book shipments itself or through independent agents other than [Patsfield] to transport any and all shipments and to deal, as needed, directly with" with the truck owners Patsfield solicited. Likewise, Patsfield did not commit to any minimum number of shipments for UV Logistics and reserved the right to solicit or book shipments or perform transportation or other services for other entities provided that, in doing so, Patsfield would not arrange to move freight for a carrier that competes with UV Logistics unless UV Logistics and its other terminal operators were unable to take the work and move that freight.

The contract specified a September 2012 start date and a September 2015 termination date, but also provided that it would automatically renew unless either party gave 30 days' notice of intent to not renew. The contract provided two ways that the parties could terminate the contract even earlier than September 2015. First, each party had the right to immediately terminate the agreement without notice if the other party breached the agreement. Second, each party had the right to terminate the agreement "for any reason or for no reason" on the first day of any calendar month after at least 30 days' notice of intent to terminate. In other words, UV Logistics always maintained the right to give 30 days' notice of termination and to have the contractual relationship end at the beginning of the next calendar

4

month, regardless of Patsfield's interest in maintaining the relationship. Patsfield had the same right. Additionally, the contract expressly stated that neither party was guaranteeing a minimum amount of work or income to the other, meaning that, even if the contractual relationship remained intact, either party could choose to have an inactive relationship and do no work with the other.

The oil and gas industry was enjoying a profitable period early in the contract's term. In 2014, Patsfield's terminal had over $7 million in gross revenues. But, during that same year, issues arose between Patsfield and Jim Burkett, a regional manager for UV Logistics. Burkett emailed two UV Logistics vice presidents—Tim Daly and Bentley Burgess—on April 11, 2014, stating that the drivers were frustrated with Patsfield and asking to transfer away from his terminal. Burkett said that the drivers would leave Patsfield if Patsfield "leaves or we get rid of him."

Three days later, on April 14, Daly emailed Patsfield to discuss "some adjustments" that were going into place. Because Patsfield and Burkett could not "come to terms on several areas of concern," Patsfield and his terminal would no longer work directly with Burkett. Daly gave Patsfield a new company contact for operational issues and a new contact for sales issues. He told Patsfield that a different regional manager, Joey Busbice, would be visiting for a few days to "assist and direct" Patsfield's operations.

Patsfield agreed to the new arrangement and apologized for adding to Daly's "workload." Later that same day, Daly responded, "Not a problem! It's what we do and we will continue to move forward with support. I need you to be patient and help us help you. We can make this ride! Thanx." Patsfield asked a follow up question about the objective for Busbice's visit, and Daly responded that Busbice was coming to "bring some understanding to your terminal from the corporate office."

About three weeks later, on May 8, 2014, Burkett forwarded an email to Daly and Burgess from a Schlumberger contact about capacity problems in the Pennsylvania area. Burkett appended the email with this comment:

> Here we are almost a month after t461's [Patsfield's terminal] hissy fit and we continue to get customer complaints. They are doing nothing to show support. This will NOT happen again. I am moving the other terminals in play. I am not letting their continued short comings continue to jeopardize the Schlumberger business. Patsfield will not be coving [sic] this up any longer.

This was the last email for four months, according to what appeared in the trial exhibits.

Then, on September 12, Daly asked Busbice and another UV Logistics regional manager, John Jueckstock, for an update on their recent meeting with a Halliburton representative named Stuart Small. Jueckstock reported that Small had told him that Patsfield was turning down orders and saying there were no trucks available. In a separate message, Jueckstock told Daly that Burkett will not "let go

6

of the past crap with [P]atsfield" and "needs to get over it." Jueckstock expressed that Burkett has been too fixated on the commission agents and should have been building the company store. Jueckstock reported to Daly that he had told Burkett to place all new customers and trucks with the company terminal (versus Patsfield's or any other's terminal).

According to the witnesses, in "late 2014, early 2015," the oil and gas market crashed. Patsfield's revenues fell. There were no emails in evidence during this down period.

On April 25, 2015, Patsfield signed a contract with New Energy to operate a terminal for that company out of his same location. Patsfield admitted in his testimony that he did not tell UV Logistics about New Energy. According to Brad Scuillo, who worked for Patsfield at the time, they were asking the trucks owners who leased to UV Logistics to switch and lease to New Energy instead. If they did, Patsfield would get a bonus for each truck that switched over.

New Energy and Patsfield set up a meeting to occur on May 4, 2015, where the truck owners could sign leases with New Energy. One of the truck owner-operators sent an email to UV Logistics, alerting them to Patsfield's activities.

On May 4, 2015, Patsfield sent an email to Tim Daly with a subject line of "Intentions." He said that he intended to stay with UV Logistics. He acknowledged that some trucks wanted to leave and had the ability to do so, but he expressed that

he did not want them to go. He added, "As I said I hope you allow us to stay but as you said the call is yours."

Daly forwarded Patsfield's email to others in UV Logistics and added a note saying that they were drafting a letter "with the intention of separating from Jimmy" Patsfield and "going after all of the trucks that are still leased to him." Bentley Burgess replied that UV Logistics should not be associated with Patsfield's "type" any longer. Another UV Logistics employee, Rusty Guibeau, responded that it remained Tim Daly's decision, but, if UV Logistics was going to part ways with Patsfield, "we need to act quickly to get the trucks that want to stay at UV[ Logistics] a home while we built [sic] up again."

UV Logistics terminated its contract with Patsfield the following day, on May 5, 2015. It did not give 30 days' notice. Its position at trial was that New Energy was a competitor, the ITOA contract between UV Logistics and Patsfield prohibited Patsfield from contracting with competitors, and UV Logistics had a contractual right to immediately terminate the contract without notice because Patsfield breached.

Patsfield disputed the characterization of New Energy as a competitor. According to Patsfield, New Energy was not a competitor of UV Logistics because it focused on commodities, like lumber and steel, instead of oil and gas freight. He

8

maintained that he did not breach the contract by entering into a side contract with New Energy.

The next email came one month later on June 12, 2015. Patsfield told Daly that he did not know whether UV Logistics had any "concrete plans yet" for the area and asked if he could schedule a meeting with Daly to see "if there is anything we can come together on." Patsfield explained that he had recently had surgery and had "been lost for a little over a year," possibly with depression or just feeling "angry." Patsfield declared that he was now "out of the fog and ready to reclaim this area." He expressed his belief that they could "put this back together" but also conceded that, if that could not happen, then "that's ok and I hope the best for you too." UV Logistics did not renew the relationship.

Five months later, Patsfield sued UV Logistics, asserting a variety of causes of action. Eventually, UV Logistics obtained summary judgment on several of those claims, leaving just two causes of action to be resolved through a jury trial: tortious interference with prospective business relations and fraudulent inducement.

At trial, Patsfield argued that UV Logistics interfered with his prospective business relationships with the truck owners by stealing them from him in May 2015 when UV Logistics terminated his ITOA agreement and asked the trucks to keep their leases with UV Logistics. Patsfield presented two separate theories on

fraudulent inducement. First, he argued that UV Logistics made promises to him to induce him into *entering* into the ITOA agreement in 2012. Second, he argued that UV Logistics made promises to him in 2014 while the contract was on-going to induce him into *continuing* to perform under the contract as it plotted to restructure and cut Patsfield out as the middleman.

Patsfield's expert, Joshua Lynn, testified about his damages. Lynn testified that he had been asked to calculate the amount of profits Patsfield would have made between the date UV Logistics terminated the ITOA and Patsfield's expected date of retirement—ten years later. He opined that Patsfield's lost profits were $2.4 million.

On cross-examination, Lynn acknowledged that both parties had the right to terminate the contract on 30 days' notice. He was asked why, then, he calculated damages over a ten-year period. He testified that he was asked to assume, in preparing his calculations, that Patsfield would lose profits up to the date of retirement. When pressed on the relevance of the ten-year period, Lynn replied:

> Again, I haven't been asked to form an opinion on the time span of my calculation. That was an assumption I was asked to make through the date of retirement. So I have no opinion on what the appropriate time frame of the calculation is.

The jury rejected Patsfield's claims for fraudulent inducement to enter into the contract and for tortious interference with prospective business relations with the truck operators. It did, however, find that "UV Logistics fraudulently induced

10

James Patsfield into remaining in the Independent Terminal Operating Agreement." In reaching that finding, the jury was guided by the following jury instruction:

> Fraudulent inducement occurs when: (1) a party makes a false promise to do an act; (2) the promise is material; (3) the promise is made with the intention of not fulfilling it; (4) the promise is made to a person for the purpose of inducing that person to remain in a contract; and (5) the person relies on the promise in remaining in that contract.

The jury awarded Patsfield $450,000 in damages on that sole cause of action.

UV Logistics appealed.

## Fraudulent Inducement to Remain in a Contract

In its first issue, UV Logistics argues that the trial court erred in entering judgment against it on the claim of fraudulent inducement to continue performing under a contract because that claim is not a recognized cause of action under Texas law and, even if it were, there was insufficient evidence to support the jury's liability finding and damages award.

### A. Preservation of error

As an initial matter, Patsfield argues that UV Logistics failed to preserve any complaint about the submission of the fraudulent inducement claim because UV Logistics did not object to the jury charge on the basis that the cause of action is invalid. Patsfield's argument presumes that making a timely jury-charge objection

11

is the only way to preserve the error UV Logistics now claims. But that is not the case.

Whether state law recognizes a particular type of tort is a question of law. *Rice v. Rice*, 533 S.W.3d 58, 60 (Tex. App.—Houston [14th Dist.] 2017, no pet.). An appellant can preserve error on a matter-of-law point by doing any of the following: (1) moving for directed verdict; (2) moving for judgment notwithstanding the verdict; (3) objecting to the submission of the question to the jury; (4) moving to disregard the jury's answer to a vital fact question; or (5) moving for new trial. *United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (citing *Cecil v. Smith*, 804 S.W.2d 509, 510–11 (Tex. 1991)).

UV Logistics moved for a directed verdict on the claim on the basis that there "is no such cause of action." UV Logistics also moved for the trial court to disregard the jury's answers and enter a judgment notwithstanding the verdict on the basis that fraudulent inducement to continue performing under a contract is not a cognizable cause of action. The first motion was denied explicitly; the second was denied implicitly when the trial court entered the judgment based on the jury's verdict. The issue was preserved. *See* TEX. R. APP. P. 33.1(a).

Nonetheless, we do not reach the issue whether fraudulent inducement to continue performing under a contract is a viable cause of action because we have

12

determined that, even if it is, there was legally insufficient evidence to support the jury's findings.

## B.     Elements of a fraudulent-inducement claim

Fraudulent inducement is a "species of common-law fraud" that "arises only in the context of a contract." *Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018). Like common-law fraud claims generally, a fraudulent-inducement claim requires proof that (1) the defendant made a material misrepresentation; (2) the defendant knew at the time that the representation was false or the defendant lacked knowledge of its truth; (3) the defendant intended the plaintiff to rely or act on the misrepresentation; (4) the plaintiff relied on the misrepresentation; and (5) the plaintiff's reliance on that misrepresentation caused injury. *Int'l Bus. Machines Corp. v. Lufkin Indus., LLC*, 573 S.W.3d 224, 228 (Tex. 2019).

A misrepresentation can occur when the defendant falsely promises to perform a future act while having no present intent to perform it. *Id.* Or it can occur when the plaintiff asks another party for performance and makes a knowingly fraudulent misrepresentation to induce that performance. *Kajima Int'l, Inc. v. Formosa Plastics Corp., USA*, 15 S.W.3d 289, 293 (Tex. App.—Corpus Christi 2000, pet. denied) (holding that party is entitled to jury question inquiring about post-contract fraud where alleged fraud is not derived from preexisting contractual obligation). The party's intent is measured at the time of the promise.

*Id.* And there must be reliance on the promise that causes injury. *Lufkin Indus.*, 573 S.W.3d at 228.

**C.** **Standard of review for sufficiency of the evidence**

When reviewing the legal sufficiency of the evidence supporting the jury's findings, we consider all the evidence in the light most favorable to the prevailing party, indulging every reasonable inference in that party's favor. *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005). We credit favorable evidence if reasonable jurors could do so and disregard contrary evidence unless reasonable jurors could not. *Id.* at 807, 827. When a party attacks the legal sufficiency of the evidence supporting an adverse finding on which he did not have the burden of proof, the party must show that no evidence supports the jury's adverse finding. *Exxon Corp. v. Emerald Oil & Gas Co.*, 348 S.W.3d 194, 215 (Tex. 2011). We sustain a "no evidence" point if there is no more than a scintilla of evidence to support the finding. *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003). More than a scintilla of evidence exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004) (citation omitted); *see Exxon*, 348 S.W.3d at 215 (stating that evidence is legally sufficient if it would enable reasonable and fair-minded people to reach verdict under review). The evidence offered to prove a vital fact is not more than a scintilla if the evidence is

so weak as to do no more than create a mere surmise or suspicion of the fact's existence. *Ford Motor Co.*, 135 S.W.3d at 601.

When reviewing the factual sufficiency of the evidence supporting the jury's findings, we consider and weigh all of the evidence, not just the evidence that supports the verdict. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001) (per curiam). We may set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that the verdict is clearly wrong and unjust. *Id.* The jury, as the fact-finder, is the sole judge of the credibility of the witnesses and the weight to be given to their testimony. *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003). As a result, we may not pass upon the witnesses' credibility or substitute our judgment for that of the jury. *Id.*; *see City of Keller*, 168 S.W.3d at 822 (as long as evidence falls within "zone of reasonable disagreement" appellate court may not substitute its judgment for that of fact-finder). The fact-finder may choose to believe one witness over another. *Estrada v. Cheshire*, 470 S.W.3d 109, 120 (Tex. App.— Houston [1st Dist.] 2015, pet. denied).

## D.    The evidence was legally insufficient to support the jury's findings against UV Logistics

The trial court instructed the jury that, to find that UV Logistics fraudulently induced Patsfield to remain in his contract, it had to find that (1) UV Logistics made a material, false promise to do an act; (2) UV Logistics made the promise

15

with the intention of not fulfilling it; (3) UV Logistics made the promise for the purpose of inducing Patsfield to remain in the contract; and (4) Patsfield relied on the promise in remaining in the contract. The jury was instructed that it could award Patsfield damages that were proximately caused by the fraudulent inducement it found.

## 1. Did UV Logistics make a promise to act

At trial, Patsfield pointed to statements in an April 2014 email as the promises on which his claim rested.

Recall, on April 11, Burkett was grumbling to Daly about Patsfield being a problem. And on April 14, Daly wrote to Patsfield that he wanted Patsfield and Burkett to end all direct communication. Patsfield was given new company contacts to deal with. Also, Busbice would travel to Pennsylvania the following week to provide guidance and assistance to Patsfield. Patsfield responded, agreeing to work with Burgess and Busbice, as requested, adding, "I am sorry to add this to your workload."

Daly's responsive email—sent in April 2014—is the email Patsfield points to as making fraudulent promises. It reads, in its entirety:

> Not a problem!
> It's what we do and we will continue to move forward with support.
> I need you to be patient and help us help you.
> We can make this ride!
> Thanx

The closest thing to a promise to act in this email is the statement "we will continue to move forward with support." Everything else is puffery and platitudes. *Cf. McNeely v. Salado Crossing Holding, L.P*., No. 04-16-00678-CV, 2017 WL 2561551, at *6 (Tex. App.—San Antonio June 14, 2017, no pet.) (mem. op.) ("statements that the property was 'well-managed' and they try to resolve complaints 'quickly' are puffery or statements of opinion and not false or material representations of fact that may support a fraud or negligent misrepresentation claim"); *HP Hotel Sponsor, LLC v. Strategic Capital Sols., LLC*, 29 Misc. 3d 1204(A) (N.Y. Sup. Ct. 2010) (holding that statements that deal is important to company will not support fraudulent-inducement claim because they lack sufficient detail and constitute mere puffery). "We can make this ride!" is a statement of encouragement, not a promise to act. "It's what we do" is equally vague and void of any promise to act.

Concluding that "we will continue to move forward with support" is the only statement in the email that is legally sufficient evidence of a promise to act, we next consider whether there is legally sufficient evidence that UV Logistics made the promise with a then-present intention to not fulfill it.

### 2. Did UV Logistics make the promise with intent not to fulfill it

Fraudulent inducement is a category of common-law fraud that involves a promise of future performance made with no intention of performing at the time it

was made. *Zorrilla v. Aypco Constr. II, LLC*, 469 S.W.3d 143, 153 (Tex. 2015). As evidence of UV Logistics's intent at the time the promise was made to not perform, Patsfield relies on an email three days earlier from Burkett stating that the drivers are unhappy with Patsfield and many would not follow Patsfield "if he leaves or we get rid of him." That statement offers two possible developments and does not advocate or indicate an intent to chose one over the other. It is no evidence of a then-present intent to break a promise to "continue to move forward with support." Patsfield offers no other contemporaneous evidence relevant to intent.

He points to other emails more than a year later that were sent after the crash in the oil and gas industry and after UV Logistics learned Patsfield had secretly talked to truck owners about leaving UV Logistics and moving their leases to a new company. Those statements, far removed in time and circumstance from the promise Patsfield points to, are no evidence of UV Logistics's intent when the promise was made a full year earlier.

### 3. Did Patsfield rely on the promise

Patsfield was asked if he relied on the 2014 promise and if he would have ended his relationship with UV Logistics but for the promise. Patsfield agreed that he had relied on it. Yet Patsfield also acknowledged that the contract had a provision that allowed either party to terminate the contract at the beginning of the month following 30 days' notice.

18

Like Patsfield, UV Logistics always maintained a contractual right to terminate. A promise in 2014 to "continue to move forward with support" cannot be read as a promise to never invoke a contractual right to terminate, ever. A statement in 2014 has little connection to the parties' actions and plans more than a year later. To the extent Patsfield relied on the statement when it was made, there is legally insufficient evidence that he was continuing to rely on that statement more than a year later, without any interim statements or promises by UV Logistics to warrant on-going reliance. *Cf. Rogers v. Zanetti*, 518 S.W.3d 394, 401 (Tex. 2017); *JIK Cayman Bay Exch. LLC v. Medina*, No. 05-16-01176-CV, 2018 WL 2045068, at *3 (Tex. App.—Dallas May 2, 2018, no pet.) (mem. op.). The statement is simply too far removed in time to provide legally sufficient evidence of reliance at or near any period of financial loss that Patsfield points to.

**4.      Were Patsfield's damages proximately caused by the inducement**

Here, too, we conclude there is legally insufficient evidence that a promise in 2014 to continue a relationship proximately caused damages more than a year later when the contract was terminated and the trucks parted ways with Patsfield. This is so for several reasons.

First, the contract expressly provides that UV Logistics did not guarantee a minimum number of shipments or services from Patsfield. Nor did it guarantee any minimum commission income. To the extent UV Logistics used the trucks

19

Patsfield coordinated through his terminal, Patsfield received a commission. But UV Logistics did not have a contractual obligation to use Patsfield's terminal. A promise to "continue to move forward" with the contractual relationship between the parties is no evidence of a promise to book trucking services with trucks operating through Patsfield's terminal. At all times, UV Logistics held the right to not use trucking services at Patsfield's terminal even if it had a contractual relationship with him.

Second, the jury rejected Patsfield's only argument for a causal link between the damages he claimed and UV Logistics's role in Patsfield involuntarily parting ways with the truck owners. According to Patsfield's briefing, his damages were the lost profits he would have made on future freight hauls by the truck owners he associated with regardless of which carrier they might have been driving for. He explained it this way: "Patsfield's injury stems from the loss of his pre-existing trucking relationships." UV Logistics's "fraudulent inducement [ ] allowed UVL to poach Patsfield's trucking clients" and caused him to lose "profits that would have occurred regardless of whether UVL was the carrier Patsfield used or not." Stated differently, "Patsfield would have been able to continue his business—by using his existing relationships at a different carrier—until his projected retirement age" had UV Logistics not taken the trucks from him"; and it was UV Logistics's fraudulent inducement that "prevented Patsfield from maintaining those relationships."

20

Patsfield asserted that he had a relationship with these truck owners before going into business with UV Logistics and that he would have continued to have a relationship with them after parting ways with UV Logistics if only UV Logistics would not have fraudulently induced him into staying in the ITOA contract. Under that argument, the damages are the lost commissions on future truck loads coordinated through a different carrier after parting ways with UV Logistics.

The problem with that theory of recovery and its underlying proximate causation argument is that the jury was separately asked whether UV Logistics tortiously interfered with Patsfield's prospective contracts with the truck owners, and the jury found that it had not. By that finding, the jury rejected the idea that UV Logistics interfered with Patsfield's ability to earn future commissions from his relationship with these truck owners. Patsfield's proximate-cause argument for damages underlying his fraudulent-inducement claim is inconsistent with the jury's finding.[1]

Third, a reasonable juror would have to conclude that any false statement in April 2014 was too attenuated to be a legal cause of the Patsfield's post-

---

[1] To the extent Patsfield might contend that some other category of damages had a causal link to the 2014 promise, he failed to offer any evidence of the damages or the link. Patsfield testified that he "probably would have left" the company if he knew UV Logistics was not serious when it said in April 2014 that it wanted to continue with the relationship. But he offered no testimony about what he would have done instead, how much money he would have made in the alternative endeavor, and what losses resulted from the missed opportunity.

termination losses in 2015. The promise to "continue to move forward" was made in April 2014. In late 2014, the market crashed, and oil and gas companies had little need for trucking services. In early 2015, Patsfield secretly contracted with another carrier and solicited truck owners who were leased to UV Logistics to switch over to Patsfield's new carrier. Only after these two significant events did UV Logistics terminate the contract and, in the aftermath, Patsfield involuntarily parted ways with the truck owners he had been coordinating.

The 2014 promise to "continue to move forward" was so far removed from the 2015 contract termination that, as a matter of law, it vitiated any causal connection between the statement and the damages allegedly incurred by Patsfield upon termination. *See Rogers*, 518 S.W.3d at 401 (stating that, "although causation is typically a question of fact, it may be determined as a matter of law when reasonable minds could not arrive at a different conclusion."); *see also JIK Cayman Bay Exch.*, 2018 WL 2045068, at *3.

As a matter of law, Patsfield's fraudulent inducement claim fails. There is legally insufficient evidence of reliance or proximate causation to find liability. A promise in 2014 to continue with a relationship is too attenuated from a termination more than a year later to establish reliance or proximate causation, given there was no evidence of follow-up assurances or promises and UV Logistics

could terminate at will with minimal notice and decline to use Patsfield's terminal under the contract even if it had not been terminated.

We sustain UV Logistics's first issue, making its second and third issues moot. We turn now to Patsfield's issues raised in his cross-appeal.

Patsfield's first issue contends that UV Logistics waived its challenge to whether fraudulent inducement into continuing a contractual relationship is a recognized cause of action. We already addressed this issue above, stating that it was not reached because we determined that Patsfield presented legally insufficient evidence to prevail on that theory regardless.

Patsfield's second issue asks whether UV Logistics waived its objections to his damages expert. Again, we do not reach that issue because we determined that the Patsfield presented legally insufficient evidence in support of the only cause of action on which he recovered damages. Thus, UV Logistics's challenge to the expert and whether it preserved that challenge are moot.

Patsfield's three remaining issues concern the trial court's grant of summary judgment to UV Logistics on various causes of action pretrial.

## Summary Judgment

UV Logistics obtained pretrial summary judgment on Patsfield's claims for breach of contract, tortious interference with an existing contract, and fraud. Patsfield raises three issues challenging the summary judgment. First, he contends

that UV Logistics's summary-judgment motion was deficient as a matter of law. Second, he contends that UV Logistics failed to meet the standard for traditional summary judgment. Third, he contends that UV Logistics failed to meet the standard for no-evidence summary-judgment.

## A. Standard of review

A party seeking summary judgment may move for both traditional and no-evidence summary judgment. TEX. R. CIV. P. 166a(c), (i). When a party has sought summary judgment on both grounds, we analyze the no-evidence motion first. *See Ridgway*, 135 S.W.3d at 600. We will not address the traditional motion if we determine the trial court properly granted the no-evidence summary-judgment motion on the same claims. *See Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39, 45 (Tex. 2017).

For a defendant to prevail on a no-evidence motion for summary judgment, the defendant must establish that no evidence supports an essential element of the plaintiff's claim on which the plaintiff would have the burden of proof at trial. *See* TEX. R. CIV. P. 166a(i); *Hahn v. Love*, 321 S.W.3d 517, 523–24 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). The burden then shifts to the plaintiff to present evidence raising a genuine issue of material fact as to each element specified in the defendant's motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). The Texas Supreme Court has provided four circumstances that

24

warrant a trial court's grant of a no-evidence motion: "(a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact." *Chapman*, 118 S.W.3d at 751.

A defendant that files a traditional motion for summary judgment has the burden to show that no genuine issue of material fact exists and that the trial court should grant judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Hillis v. McCall*, 602 S.W.3d 436, 440 (Tex. 2020). For a defendant to be entitled to traditional summary judgment, the defendant must negate at least one essential element of each of the plaintiff's claims. *See StarNet Ins. Co. v. RiceTec, Inc.*, 586 S.W.3d 434, 443 (Tex. App.—Houston [1st Dist.] 2019, pet. denied).

We review a trial court's grant of summary judgment de novo. *Trial v. Dragon*, 593 S.W.3d 313, 316 (Tex. 2019). "When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor." *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005).

**B.    Whether UV Logistics's summary-judgment motion was defective as a matter of law**

Patsfield contends that UV Logistics's summary-judgment motion could not support judgment on the challenged claims. Though not presented as separate challenges, he appears to make three arguments to support his contention. The first is that the trial court erred to the extent it granted UV Logistics summary judgment on no-evidence grounds because the motion, which purported to be a hybrid motion, failed to raise no-evidence points clearly enough to maintain its no-evidence character. He cites *Waite v. Woodard, Hall & Primm, P.C.*, 137 S.W.3d 277 (Tex. App.—Houston [1st Dist.] 2004, no pet.) in support of this argument. The issue in *Waite*, though, has no connection to these alleged failures in UV Logistics's motion.

In *Waite*, the movant sought summary judgment on a claim for which it had the burden of proof, yet the movant cited to Rule 166a(i) and the no-evidence standard without citing to Rule 166a(c) or the traditional standard even once. *Id.* at 281. The trial court granted summary judgment. *Id.* at 279. The appellate court reversed, holding that the movant could not obtain no-evidence summary judgment on a claim for which it had the burden of proof. *Id.* at 281.

The movant urged the appellate court to read its motion as also seeking traditional summary judgment and to affirm the judgment on the basis that it had established the elements of its claim as a matter of law. The appellate court

refused, noting that the motion only cited to the no-evidence rule and standard, did not cite to the traditional rule or standard, and did not indicate, by any means, that it was seeking judgment by proving the cause of action conclusively. *Id.*

Here, UV Logistics's motion states that it "is being brought as both a traditional motion under Rule 166a of the Texas Rules of Civil Procedure and as a No-Evidence Motion for Summary Judgment." It goes on to detail both rules and legal standards and to argue for judgment on claims for which Patsfield had the burden of proof. UV Logistics's hybrid motion had neither of the problems discussed in *Waite*, and we fail to see how *Waite*'s holding supports ignoring the no-evidence portion of UV Logistics's motion.

Patsfield's second argument is that the motion fails as a no-evidence motion under *Cuyler v. Minns*, 60 S.W.3d 209, 213 (Tex. App.—Houston [14th Dist.] 2001, pet. denied), because it did not single out the elements for which it contended Patsfield lacked any evidence. In *Cuyler*, a summary judgment motion purported to be a hybrid motion seeking summary judgment on traditional and no-evidence grounds, but the motion did not specify for which elements there was no evidence. *Id.* at 212.

UV Logistics sought no-evidence summary-judgment on Patsfield's breach-of-contract claim. That section of the motion began with the heading, "Alternatively, There is No Evidence of Any Damages (TRCP 166a(i))," and then

27

argued that Patsfield "failed and refused to produce any evidence showing loss of net profits as a result of any alleged conduct on the part of UV Logistics." Its motion also sought no-evidence summary-judgment on Patsfield's claim for tortious interference with existing contracts. That section was titled, "No Evidence of Tortious Interference with Contracts" and argued there was no evidence of a valid contract between Patsfield and third party customers or clients. Finally, UV Logistics sought no-evidence summary-judgment on Patsfield's fraud claim. That section starts with the sentence, "Because there is no evidence that Defendants made any material, false representations to Plaintiff, Plaintiff's fraud claim fails as a matter of law." In each instance, UV Logistics pointed out the elements for which it contended there was no evidence.

Patsfield's third argument is that the motion lacks specificity to provide notice of the arguments being made. When a summary judgment motion is attacked on specificity grounds, a special exception is required. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 342 (Tex. 1993) ("An exception is required should a non-movant wish to complain on appeal that the grounds relied on by the movant were unclear or ambiguous."); *Franco v. Slavonic Mut. Fire Ins. Ass'n*, 154 S.W.3d 777, 784 (Tex. App.—Houston [14th Dist.] 2004, no pet.). Patsfield specially excepted to the summary-judgment motion in his response to the motion, but he does not point anywhere in the record to a ruling on his special

exception. Without a ruling on his challenge, this issue is not preserved on appeal. *Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 765 (Tex. App.—Texarkana 2017, pet. dism'd); *Smith v. Grace*, 919 S.W.2d 673, 678 (Tex. App.—Dallas 1996, writ denied).

Having rejected Patsfield's three arguments for finding UV Logistics's summary-judgment motion deficient as a matter of law, we overrule his third issue.

## C.      Whether the trial court erred in granting no-evidence summary judgment

Next, Patsfield argues that the trial court erred in granting no-evidence summary-judgment on his breach of contract, tortious interference with existing contract, and fraud claims.

### 1.      Breach of contract

UV Logistics's summary-judgment motion argued that, even assuming it had breached the agreement by not giving 30 days' notice of termination, Patsfield presented no evidence of damages arising out of that breach. Patsfield contends that his damages "arose from UVL's denial of his benefit of 30 days' notice" of termination, in that the lack of a notice period deprived him of the time needed "to transfer his business connections to another terminal."

In his response to the summary-judgment motion, Patsfield asserted that, due to the lack of notice, "drivers, executives, and companies were unable to continue working with [him] due to the abrupt change in circumstances. Had [he] been

29

allotted the 30-days' notice, [he] could have informed these parties of his change in location and continued to do business with these parties in a new terminal. [He] was deprived of this opportunity which was contractually promised to him and thus the loss suffered extended past the compensation which he was entitled to or even contemplated under the [contract]." The lack of notice "prevented [Patsfield] from rerouting his business to another terminal/company if those drivers and customers chose" to " go along with [him]." This argument, Patsfield contends, "has provided more than a scintilla of evidence that [UV Logistics's] breach of the contract has caused [him] damages."

We conclude that the trial court did not err in granting no-evidence summary judgment on the breach of contract claim because Patsfield presented no evidence of damages. Patsfield alleges he would have used the 30-day notice period to alert truck owners and customers of his new affiliation with a different carrier and invite them to move to the new carrier but that, without notice, he was unable to do so. The evidence does not match his assertion.

According to the evidence, he signed a contract with a new carrier, New Energy, *before* UV Logistics terminated his contract. He also sent an email, which is in the summary-judgment evidence, to the drivers with whom he had a relationship, *before* termination, inviting them to move over to New Energy. That email set up an informational meeting where New Energy would seek to sign lease

30

agreements with the truck owners who had been leasing to UV Logistics and operating through Patsfield's UV Logistics terminal. And he operated the newly created New Energy terminal in the exact same location where he had operated the UV Logistics terminal, meaning that Patsfield could be found at that same location even after termination, should any customers or drivers want to continue a relationship with him. According to the summary-judgment evidence, Patsfield took the steps that he claimed he was foreclosed from taking by the lack of notice.

Further, Patsfield's own deposition testimony confirmed that the truck leasing agreements are between the truck owners and the carriers (e.g., UV Logistics and New Energy), not Patsfield. The truck owners decide which company to lease their equipment to. Likewise, the customers control which carriers they work with. Neither the truck owners nor the customers had contracts with Patsfield directly. He had no contractual right to continued business or loyalty from either.

Patsfield argued that trucks might have stayed on with him had he had the opportunity to ask them to. But he asked. And he had a new carrier agreement in place to allow those trucks to sign on to haul freight, if they chose to do so. Patsfield conceded that they held the choice, not him. Patsfield failed to provide any evidence of damages arising from UV Logistics's alleged failure to provide 30 days' notice of terminating the contract.

## 2. Tortious interference with existing contracts

UV Logistics moved for summary judgment on the tortious-interference claim, arguing that Patsfield offered no evidence of existing contracts that UV Logistics could have interfered with. Patsfield responded that he had oral and implied contracts with oil companies in need of freight hauling and with truck owners.

A tortious-interference claim requires evidence of a valid, enforceable contract that the defendant interfered with. *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017). Patsfield offered no evidence of an enforceable contract with any customers or truck owners. He conceded in his deposition that the customers' contracts were with the carriers directly. In this case, the contracts were with UV Logistics directly. Likewise, the truck owners' leasing agreements were with the carriers directly, not with Patsfield. Patsfield concedes that neither group had any written contracts with him.

Patsfield agreed in his deposition that these groups had no contractual obligation to work with him or give him business:

Q: So none of these companies that you're claiming were your customers were under any obligation whatsoever to give any business to you. Is that right?

A: They weren't under obligation.

When he discussed agreements that he claimed to have with these two groups, what he described was a business relationship whereby they "would call him first" and had expressed a preference to work with him. He provided no evidence of an enforceable agreement that could be subject to a breach claim.

Because Patsfield presented no evidence of an enforceable contract with a third party, the trial court did not err in granting no-evidence summary judgment on this claim.

### 3.    Fraud

UV Logistics moved for no-evidence summary judgment on Patsfield's fraud claim, arguing that there was no evidence of a material, false representation. *See Ernst & Young, L.L.P. v. Pac. Mut. Life Ins. Co.*, 51 S.W.3d 573, 577 (Tex. 2001) (listing elements of fraud claim).

Patsfield responded by pointing to the same 2014 emails discussed earlier, which were sent a year before the contract was terminated and the damages Patsfield alleges he suffered. He points to those same emails in his appellate brief. Those emails, though, contain no promises on which Patsfield could have relied to cause damages. At most, UV Logistics promised to "continue to move forward," which it did for a full year, without ever abandoning its contractual right to terminate at any time for any reason with 30 days' notice or immediately in the

event of a breach. The emails provide no evidence in support of this cause of action.

We overrule Patsfield's sixth issue. Having determined that the trial court did not err in granting summary judgment on these claims on no-evidence grounds, we do not reach Patsfield's issue challenging whether UV Logistics was entitled to summary judgment on traditional grounds on these same causes of action.

## Conclusion

We reverse and render judgment for UV Logistics.


Sarah Beth Landau
Justice

Panel consists of Chief Justice Radack and Justices Kelly and Landau.