

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| ETC TEXAS PIPELINE, LTD. and LG PL, LLC, | § | No. 08-23-00010-CV |
| | § | Appeal from the |
| Appellants, | § | 36th Judicial District Court |
| v. | § | of McMullen County, Texas |
| AGERON ENERGY, LLC, | § | (TC# M-22-0011-CV-A) |
| Appellee. | § | |

**O P I N I O N**

This case arises from a dispute over Appellee's inability to access minerals pursuant to its mineral lease due to an underground hydrogen-sulfide ($H_2S$) disposal site above the formation housing the minerals. Appellants ETC Texas Pipeline, Ltd. and LG PL, LLC (collectively, ETC) operate the subject $H_2S$ disposal well. Appellee Ageron Energy, LLC (Ageron) is a drilling company. Ageron sued ETC for negligence, nuisance, and trespass, alleging that ETC's disposal operation damaged its equipment and prevented it from mining its minerals. ETC moved to dismiss Ageron's suit on two grounds. First, ETC contended that Ageron lacks standing because the claims accrued to prior owners of the land, thereby depriving the trial court of subject-matter jurisdiction. Second, ETC contended that Ageron's claims are "based on" or "in response to" certain of ETC's

communications protected under the Texas Citizens Participation Act (TCPA), thereby entitling ETC to assert affirmative defenses under TCPA's procedural framework, including its provision for an interlocutory appeal.

Ultimately, we find that Ageron lacks standing to bring its claims due to the legal-injury and single-action rules, as the claims accrued to members of the Dickinson family who owned the mineral estate in common when the land was first injured. Because subject-matter jurisdiction is lacking, we reverse the trial court's denial of ETC's motion to dismiss on that ground and render judgment dismissing Ageron's claims; based on this disposition, we do not reach ETC's TCPA claim.[1]

## FACTUAL AND PROCEDURAL BACKGROUND

ETC's $H_2S$ disposal well is the subject of *Regency Field Services, LLC v. Swift Energy Operating, LLC*, 622 S.W.3d 807 (Tex. 2021), which both parties cite extensively for background information, relevant facts, and legal analysis. *Regency* sets the stage for discussing $H_2S$ disposal wells as follows:

> Natural gas is either sweet or sour. Sour gas, which contains high levels of [$H_2S$], is unfit for use in generating light or fuel for domestic purposes. Often described as smelling like rotten eggs, [$H_2S$] is extremely poisonous, corrosive, flammable, and explosive. Among other things, it contaminates hydrocarbons and destroys wells and equipment used to produce them.
>
> Natural gas producers can treat sour gas to remove [$H_2S$]. But then they must carefully dispose of it. Sometimes they burn (or "flare") it off or haul it away to a disposal site. But they may also dispose of it by injecting it through a well into a depleted subsurface reservoir. Those who plan to operate such an injection well must first obtain a permit from the Texas Railroad Commission [(TRC)].

622 S.W.3d at 811–12 (internal citations and quotation marks omitted).

---

[1] This case was transferred from the Fourth Court of Appeals, and we decide it in accordance with the precedent of that court to the extent required by TEX. R. APP. P. 41.3.

In 2007, ETC's predecessor, Regency Field Services (Regency), obtained a permit to operate the $H_2S$ disposal well at issue. The well injects highly concentrated $H_2S$ into the Wilcox formation, a depleted mineral field located about 5,800 feet below the surface. Above the Wilcox, at about 5,000 feet, is the Carrizo aquifer, a significant water resource. Below the Wilcox, at about 9,400 feet and 11,000 feet respectively, are the Olmos and Eagle-Ford formations, two high-producing mineral fields. $H_2S$ is not native to the Wilcox and is present there only because of ETC's disposal operation. While injected $H_2S$ generally spreads horizontally away from the well site, its precise traveling path and speed are not predictable. In its original permit application, Regency estimated that the injectate "plume" would take 40 years to migrate 2,220 feet.

In February 2012, Regency obtained an amended permit allowing it to increase the injection volume, based in part on an updated estimate that the injectate plume would take 30 years to migrate 2,900 feet. However, six months later, in August 2012, $H_2S$ was detected on the Quintanilla Ranch in the JCB Horton #1 oil and gas well, a producing well located 3,300 feet from the injection site. The Horton #1 well had to be plugged and abandoned. Regency temporarily halted its operations, performed remedial measures, and then, with the TRC's approval, resumed injecting at a reduced rate and pressure. Two months later, in October 2012, $H_2S$ was detected on the Dickinson Ranch in the Dickinson No. 2 oil and gas well, an inactive well located 1,650 feet from the injection site. In November 2012, $H_2S$ escaped to the surface and killed several cows on the Dickinson Ranch.

In 2014, owners of the Quintanilla Ranch sued Regency for $H_2S$-related injuries. Owners of the Dickinson Ranch intervened, asserting similar injuries. While the Dickinson Ranch's surface estate had been partitioned among Dickinson family members in 1975, ownership of its mineral estate remained undivided among the family members. Both estates—surface and mineral—were

alleged to have been damaged.

In 2015, Regency merged into ETC, which took over the $H_2S$ disposal operation. The same year, Swift Energy Operating, LLC (Swift), which held a number of mineral leases in the area, intervened in the Quintanilla suit.

In 2017, Regency settled with the Quintanillas and Dickinsons then sought summary judgment against Swift based on limitations. Regency prevailed in the trial court, but the Texas Supreme Court reversed and remanded in 2021, and Swift ultimately obtained a $42-million jury verdict.

Meanwhile, in 2018 and 2019, Action Energy, LLC acquired a number of mineral leases in the area, including on the Dickinson Ranch. Ownership of the Dickinson Ranch's mineral estate had remained undivided among its surface owners. Action Energy's lessors included Dickinson intervenors in the Regency lawsuit, other Dickinson family members, and other persons. While Action Energy's leases encompassed a total of 953 acres, only 53.3 of those acres were involved in the Regency suit.

In January 2020, Action Energy assigned its leases to Ageron.

In 2021, Ageron obtained a permit to drill an oil and gas well on the Dickinson Ranch. This well is located 800 feet from ETC's $H_2S$ disposal well. Ageron's permit application noted that its well would be in an $H_2S$ area and that "[t]his is a[n] [$H_2S$] field." Further, Ageron's drilling fluid program noted that "[ETC's injection well] is inject[ing] $H_2S$ in the Wilcox Formation" and "$H_2S$ is as high as 34%." Ageron's program also contained a discussion of "$H_2S$ concerns" relating to its drilling operation and how these concerns would be addressed. In addition, Ageron's permit application included a 40-page $H_2S$ Contingency Plan for "alerting and protecting the public within an area of exposure prior to an intentional release or following the accidental release of a

4

potentially hazardous volume of [$H_2S$]" from Ageron's well.

Before Ageron began drilling, it received a letter from ETC reading in part as follows:

> It has come to the attention of [ETC] that [Ageron] is building a drilling pad adjacent to ETC's Tilden gas processing plant, in McMullen County, Texas, and that Ageron intends to drill multiple wells from that surface location. It is ETC's understanding that Ageron's wells will target the Eagle Ford formation at an approximate depth of 11,000 feet (or deeper), and that the wells will be drilled and completed as horizontal wells.

> The purpose of this letter is to notify Ageron that ETC operates an acid gas injection well (injecting $H_2S$ and $CO_2$) as part of ETC's operations at its Tilden gas processing plant. Any well that Ageron drills deeper than 5870' TVD from the surface location adjacent to the Tilden plant will necessarily drill through the portion of the Wilcox formation in which injection takes place. ETC wants Ageron to be aware of the ongoing acid gas injection operations so that Ageron can plan for, and put in place, all necessary safety measures and operational procedures to ensure that no injectate is released from ETC's permitted injection interval in the Wilcox formation during the drilling, completion and production of Ageron's wells.

In follow-up phone calls and emails, ETC asked Ageron to provide ETC with its plans for (1) drilling safety and contingency protocols; (2) wellbore casing; (3) drilling mud; and (4) drilling trajectory and depths. Ageron complied. ETC did not respond.

In February 2022, Ageron began drilling, reaching a depth of 5,896 feet on March 5, 2022. At that point, 26 feet into the Wilcox, Ageron implemented protocols using state-of-the-art techniques and materials, which Ageron's experts thought could withstand exposure to the corrosive effects of concentrated $H_2S$. Ageron also asked ETC to pause its injection operation while Ageron drilled through the Wilcox, but ETC refused.

Despite Ageron's precautions, $H_2S$ ate through Ageron's drill pipe, completely severing it at 61 feet into ETC's injection zone. $H_2S$ vapor also spewed from the ground, triggering sirens and flares. Ageron's well had to be plugged and abandoned. Further, because this well comprised the sole drilling operation sustaining Ageron's leases in the area, all of Ageron's leases expired when

5

the well failed. Ageron assessed its damages at $197,400,000.

In June 2022, Ageron sued ETC, asserting claims for negligence, nuisance, and trespass. In July 2022, ETC answered, generally denying Ageron's claims. In August 2022, ETC filed a motion to dismiss on two grounds: (1) Ageron's alleged lack of standing to assert $H_2S$-related claims, which ETC argued had previously accrued to the Dickinson Ranch's owners; and (2) ETC's alleged entitlement to relief under the TCPA, which ETC argued protects certain of its communications with the TRC relating to the $H_2S$ disposal well permitting. The trial court denied ETC's motion to dismiss in its entirety, addressing the two grounds in separate orders. Neither order specified a reason for the court's ruling. ETC then brought this interlocutory appeal under the TCPA.

## STANDARD OF REVIEW AND APPLICABLE LAW

### A. Standing and subject-matter jurisdiction

Standing is a prerequisite to subject-matter jurisdiction. *State v. Naylor*, 466 S.W.3d 783, 787 (Tex. 2015). Standing focuses on whether a party has a sufficient relationship with the lawsuit to have a "justiciable interest" in its outcome. *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005). Standing may be raised at any time. *Id*. at 849. Whether a party has standing, and thus whether a court has subject-matter jurisdiction, is a question of law subject to de novo review. *McFadin v. Broadway Coffeehouse, LLC*, 539 S.W.3d 278, 282 (Tex. 2018).

A subject-matter-jurisdiction challenge may focus on the pleadings, jurisdictional facts, or both. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018). If the pleadings are challenged, we determine whether the plaintiff has alleged facts that affirmatively demonstrate subject-matter jurisdiction. *Id*.

If jurisdictional facts are challenged, we look beyond the pleadings and consider relevant

6

evidence, even if the evidence implicates the merits of the case. *Id.* at 770–71. The procedural framework we employ resembles the one used to evaluate a traditional summary judgment motion: "[I]f the plaintiffs' factual allegations are challenged with supporting evidence . . . , to avoid dismissal plaintiffs must raise a genuine issue of material fact to overcome the [jurisdictional] challenge[.]" *Id.* at 771. In determining whether a fact issue exists, we take as true all evidence favorable to the plaintiff, indulging every reasonable inference and resolving any doubts in the plaintiff's favor. *Id.*

## B. Subject-matter jurisdiction and the TCPA

In reviewing a jurisdictional challenge in the context of an interlocutory appeal under the TCPA, we first address whether jurisdiction exists, and if it does not, our inquiry ends; that is, the case is dismissed for lack of jurisdiction, no TCPA issues are considered, and any TCPA-related orders by the trial court are vacated as moot.[2] *In re Lubbock*, 624 S.W.3d 506, 512 (Tex. 2021) (orig. proceeding) (Lubbock I) (addressing dispositive jurisdictional issue first where both jurisdictional and TCPA issues were before the court); *Diocese of Lubbock v. Guerrero*, 624 S.W.3d 563, 564 (Tex. 2021) (per curiam) (Lubbock II) ("Inasmuch as the trial court lacks jurisdiction to proceed in the underlying litigation, the collateral matters under the TCPA asserted in this interlocutory appeal are moot. . . . The trial court's underlying interlocutory order and the court of appeals' judgment are accordingly vacated, and the cause is dismissed.");[3] *Johnson v. Johnson*, No. 04-19-00500-CV, 2020 WL 214762, at *4 (Tex. App.—San Antonio Jan. 15, 2020,

---

[2] We note that ETC argues that if Ageron lacks standing, we need proceed no further, and Ageron does not object.

[3] *Lubbock I* and *II* consisted of a mandamus proceeding involving a jurisdictional issue and a related TCPA interlocutory appeal involving TCPA claims. While here, we have only a TCPA interlocutory appeal involving both a jurisdictional issue and a TCPA claim, we view this as a distinction without a difference for the purpose of this analysis.

no pet.) (mem. op.) (holding that appellate court first inquires whether jurisdiction exists, and if not, dismisses for lack thereof and reverses any TCPA-related trial court orders).

### C. Accrual of claims for injury to land

A claim for injury to land accrues when the injury occurs. *Exxon Corp. v. Emerald Oil & Gas Co., L.C.*, 331 S.W.3d 419, 424 (Tex. 2010) (citing *Houston Water-Works Co. v. Kennedy*, 8 S.W. 36, 37 (1888)). The right to sue belongs to the person who owns the land when the injury occurs and does not pass to a subsequent owner without an express assignment. *Id.* A subsequent lessee, including a mineral interest lessee, can stand in no better shoes than a subsequent owner. *Id.* at 425. A party that lacks a right to sue lacks standing, which implicates subject-matter jurisdiction. *Id.* at 425.

Ageron asserts claims for negligence, nuisance, and trespass. *Regency* explains that: (a) a negligence claim accrues when the conduct at issue causes any legal injury for which legal relief may be obtained; (b) a nuisance claim accrues when the conduct first substantially interferes with the use and enjoyment of land by causing unreasonable discomfort or annoyance to persons of ordinary sensibilities; and (c) a claim for trespass to a *mineral lessee's* rights accrues when "unauthorized conduct first invades or interferes with the claimant's legal rights 'to explore, obtain, produce, and possess the minerals subject to the lease,'" while a claim for trespass to a *surface owner's* rights accrues "when the unauthorized entry occurs, even if the entry does not cause a discernable injury or damages." 622 S.W.3d at 815–16, & n.18 (emphasis added).[4]

---

[4] In *Regency*, the Texas Supreme Court noted that it has "not decided whether subsurface migration can cause an actionable trespass to a surface owner's possessory interest in the subsurface space," citing three previous cases where it declined to decide this issue. 622 S.W.3d at 816 n.18. And while ETC cites *XTO Energy Inc. v. Goodwin*, 584 S.W.3d 481 (Tex. App.—Tyler 2017, pet. denied) and *Myers-Woodward, LLC v. Underground Servs. Markham, LLC*, No. 13-20-00172-CV, 2022 WL 2163857 (Tex. App.—Corpus Christi 2022, pet. filed) (mem. op.) as having held that a surface owner has a legally protected ownership interest in the subsurface of his property that would support a trespass cause of action, neither of these cases involved subsurface migration.

*Regency* further explains that the legal-injury and single-action rules may affect when an injury-to-land claim accrues. Under the legal-injury rule, a party's claims based on wrongful conduct still accrue even if the claimant (1) does not yet know a legal injury occurred, (2) has not yet experienced or gained knowledge of the full extent of the injury, (3) does not yet know the specific cause of the injury or the party responsible, (4) later suffers additional injuries, or (5) has not yet suffered or cannot yet ascertain any or all of the resulting damages. 622 S.W.3d at 814.

Under the single-action rule, wrongful conduct gives rise to a single, indivisible action in which a claimant must pursue all claims for all damages from all resulting injuries, and those claims all accrue when the first such injury occurs. *Id*. at 814–15. Further, where property is jointly owned, all co-owners are necessary parties to a suit for damages arising from a trespass or tort, both because "the law abhors a multiplicity of suits" and because, "though the estates of the cotenants or joint owners are several, yet the damages survive to all; and it would be unreasonable to allow several actions for damages for one single trespass." *Taylor v. Catalon*, 166 S.W.2d 102, 105 (Tex. 1942).

Finally, accrual of a claim may be delayed under the discovery and fraudulent concealment rules, but these rules apply only to a party who owned the land when the injury occurred, not to subsequent owners or lessees. *See La Tierra de Simmons Familia, Ltd. v. Main Event Ent., LP*, No. 03-10-00503-CV, 2012 WL 753184, at *7 (Tex. App.—Austin Mar. 9, 2012, pet. denied) (mem. op.).

> Our sister courts have held, however, that the discovery rule does not apply if the plaintiff lacks standing to bring the claim, reasoning that the discovery rule relates to limitations and "the question of limitations cannot arise unless the plaintiff has standing to come into court." [*Senn v. Texaco, Inc.*, 55 S.W.3d 222, 225–26 (Tex. App.—Eastland 2001, pet. denied)] ("The discovery rule cannot work to transfer the ownership of a cause of action from one person to another simply because the second person claims to have discovered the injury."); *see also*

[*Boerschig v. Southwestern Holdings, Inc.*, 322 S.W.3d 752, 767 (Tex. App.—El Paso 2010, no pet.)] ("The discovery rule is not applicable in cases where the subsequent property owner lacks standing to sue for an injury to land that occurred prior to passage of title."); *Brooks v. Chevron USA Inc.*, No. 13-05-00029-CV, 2006 WL 1431227, at *9 (Tex. App.—Corpus Christi May 25, 2006, pet. denied) (mem. op.) ("Neither fraudulent concealment nor the discovery rule operate[s] to vest a cause of action in an individual [who otherwise lacks standing].").

*Id.*

## ANALYSIS

ETC raises two issues on appeal, arguing: (1) Ageron lacks standing because the claims it asserts previously accrued to the Dickinson Ranch's owners, thus subject-matter jurisdiction is lacking; and (2) ETC is entitled to dismissal under the TCPA because the statute protects certain of its communications with the TRC. Because we agree that Ageron lacks standing, we do not reach ETC's TCPA argument. ETC's standing argument addresses both Ageron's pleading and the jurisdictional facts and evidence. We consider each in turn.

### A. Standing and Ageron's pleading

ETC correctly argues that Ageron has standing as a mineral lessee only if: (1) Ageron holds assigned claims from a prior landowner or lessee; or (2) the mineral interests asserted by Ageron were first injured after Ageron acquired its leases in January 2020. *Emerald Oil*, 331 S.W.3d at 424. It is undisputed that Ageron holds no assigned claims.

In regard to whether the mineral interests at issue were first injured after January 2020, ETC argues that Ageron's own pleading negates its standing by alleging that in 2012 migrating $H_2S$ from ETC's disposal well interfered with third-party drilling operations thousands of feet from the injection site.[5] ETC further argues that while Ageron's pleading states that its mineral interests

---

[5] Ageron's pleading does not indicate its drilling site's distance or direction from ETC's injection well, or in what direction from the well any third-party's drilling operations may have been located. The pleading also does not allege when the $H_2S$ plume first reached Ageron's drilling site. However, on appeal Ageron does not argue that this event

were first injured in February 2022, this is a mere legal conclusion unsupported by an allegation that, for instance, migrating $H_2S$ first reached land covered by Ageron's leases in 2022 or first became sufficiently concentrated to interfere with mineral development there at that time.

In contrast, Ageron argues that it does not matter when $H_2S$ reached its leaseholds, contending that its mineral-development claims did not accrue until it actually attempted to drill and was thwarted by $H_2S$. In support of this theory, Ageron cites the Texas Supreme Court's opinions in *Lightning Oil Co. v. Anadarko E&P Onshore, LLC*, 520 S.W.3d 39 (Tex. 2017) and *Regency*, and this Court's opinion in *Lyle v. Midway Solar, LLC*, 618 S.W.3d 857 (Tex. App.—El Paso 2020, pet. denied).

**(1)  *Lightning Oil***

*Lightning Oil* involved a mineral lessee whose minerals were located under a protected wildlife area. 520 S.W.3d at 43. The lessee planned to drill a vertical well on an adjacent property, then "kick-off" a horizontal well to reach its minerals. *Id*. The mineral lessee on the adjacent property sued for trespass, alleging that the planned wellbore would necessarily pass through its mineral estate. *Id*. Several holdings emerged from *Lightning Oil*. First, the small amount of hydrocarbons lost when a well is drilled through a mineral estate does not support a trespass claim. *Id*. at 51. Second, while a mineral lessee has a right to extract its minerals, it has no right to possess or exclude others from the physical space where its minerals are located. *Id*. at 49. Third, a trespass on a mineral estate occurs only if the mineral lessee's ability to exercise its rights, e.g., to explore for and extract minerals, is interfered with or infringed on. *Id*. Fourth, because prospective relief was sought, proof of imminent, irreparable harm was required, and mere speculation that the

occurred after January 2020.

11

defendant's planned drilling activities would interfere with the plaintiff's own future mineral development was not enough. *Id*.

Applied here, *Lightning Oil*'s second and third holdings lead us to conclude that Ageron has no right to exclude ETC from injecting $H_2S$ into the Wilcox and has a claim for trespass only if the injected $H_2S$ interferes with or infringes on Ageron's ability to extract its minerals. On these points, we agree with Ageron. But because *Lightning Oil* involved a different type of alleged harm, i.e., physical displacement of minerals, this opinion provides little guidance regarding how or when a mineral developer's "interference" or "infringement" claim might accrue in the context of harm caused by migrating $H_2S$ —that is, whether ETC is correct that such a claim accrues when, e.g., $H_2S$ arrives at a particular site or reaches a certain concentration there, or whether Ageron is correct that such a claim accrues only when an actual attempt to drill is thwarted by $H_2S$.

**(2)** *Regency*

*Regency*, as noted above, involved the same migrating $H_2S$ plume that halted Ageron's drilling operation and the same causes of action against the disposal-well operator, i.e., negligence, trespass, and nuisance. However, *Regency* involved a different claim-accrual theory.

Unlike Ageron, Swift did not allege a failed drilling attempt thwarted by $H_2S$. Instead, Swift alleged pre-drilling injuries, including that its mineral interests were "in the path" of the $H_2S$ plume and contamination was "inevitable," its interests were "already imperiled," it was unable to safely and economically develop its minerals, and the plume had "substantially interfered" with its use and enjoyment of its mineral estate. *Regency*, 622 S.W.3d at 822–23. Swift further alleged pre-drilling damages, including costs to investigate $H_2S$ safety measures, costs of periodic well-sampling, and decreased value of its mineral estate. *Id*. at 823. However, Swift's pleading did not allege precisely when or how it was first injured by migrating $H_2S$, leading the Texas Supreme

12

Court to conclude that the pleading failed to conclusively show that Swift filed suit more than two years after accrual of its claims. *Id.* at 823–24. In particular, the Court noted that while Swift's allegation that its mineral interests were "already imperiled" appeared to be based on a study which suggested $H_2S$ may have reached Swift's leaseholds as early as 2009, i.e., more than two years before Swift filed suit in 2015, summary judgment was improper because Swift's pleading did not "clearly and unequivocally" allege whether Swift's mineral interests became "imperiled" when the $H_2S$ first reached the relevant location or at some point thereafter. *Id*. at 823.

In other words, because Swift's pleading left unresolved whether its claims accrued when $H_2S$ reached its leaseholds or at some later point, *Regency*'s holding left this issue unresolved as well, deciding only that Swift's pleading did not by itself entitle Regency to summary judgment. Thus, even if Ageron is correct that *Regency* confirms that physical invasion by migrating $H_2S$ in and of itself does not cause a mineral-interest claim to accrue, *Regency* brings us no closer to deciding whether ETC or Ageron is correct with respect to when and how the claims at issue accrued.

### (3) *Lyle*

*Lyle* involved mineral lessees whose estate was located under a tract of land largely covered by a solar array. 618 S.W.3d at 872. The lessees alleged they could not realistically develop their mineral interests because of the presence of the solar panels and associated transmission lines, but they also admitted they had no current development plans. *Id*. at 862, 874. We concluded the lessees' claims were unripe, holding that any trespass or breach of contract claims were premature until the mineral lessees "actually seek to develop their mineral estate." *Id*. at 875. We further noted that it appeared the lessees had "taken no steps in that direction," such as leasing out their mineral interests, commissioning geological studies, entering into drilling contracts, or marketing

13

their estate. *Id*. at 863, 874–75. Thus, to the extent *Lyle* says anything about how mineral-interest claims accrue, it leaves open the possibility that triggering events might include entering into contracts, commissioning studies, and other pre-drilling conduct. However, with respect to when or how mineral-interest claims accrue in the specific context of harm caused by migrating H₂S, *Lyle*, like *Lightning Oil* and *Regency*, provides little to no guidance.

In the end, we conclude that ETC's accrual theory (migrating H₂S claims accrue when H₂S reaches a particular location or concentration) and Ageron's accrual theory (such claims accrue only when a drilling attempt fails) are both unsupported by clear precedent or close analogies to prior cases. Thus, we turn from the pleadings and next consider whether jurisdictional evidence might lead to an outcome based on settled law rather than requiring us to venture into uncharted territory.[6]

---

[6] The concerns that give us pause here are at least two-fold. First, as noted above, *Regency* left unresolved not only the question of when and how a mineral developer's migratory H₂S claims might accrue, but also the underlying question of whether subsurface migration of a substance gives rise to an actionable claim in the first place, a question the court noted it had declined to address on three previous occasions. 622 S.W.3d at 816 n.18. We similarly find that tackling these questions is unnecessary to our decision here, as explained in part B below. Second, whether mineral-development claims based on migrating subsurface contaminants, if actionable, should be held to accrue based on any of the potential triggering events mentioned above—i.e., the location or concentration of the contaminants (as ETC suggests), a failed drilling attempt (as Ageron suggests), "imperilment" of minerals "in the path" of the contaminants (as Swift's pleading in *Regency* suggests), or perhaps some other event such as commissioning of a geological study, entering into a drilling contract, or marketing a mineral estate (as *Lyle* might suggest)—involves complex considerations not fully explored in the briefing before us. Even the mechanics of Ageron's failed-drilling-attempt accrual theory are not fully developed. For example, in response to the argument that under such a theory drilling-interference claims would accrue "anew" with each hypothetical new lessee, Ageron simply states that "No such thing would result. Such claims would accrue just once—when initial interference happens." Such a terse explanation does not convincingly discredit the scenario posited by ETC if such an accrual theory were to be recognized. From ETC's argument at the hearing before the trial court:

> Under Ageron's theory now, another E&P company can show up in the exact area, take the exact same lease through Betty Dickinson or the Dickinsons together. They can . . . know all about the H₂S that has been there for 15 years and that it has accrued all of the trespass and nuisance that has been there for 15 years, and the new E&P company can show up, drill another well 100 feet to the left of Ageron's well, they can go down to the Wilcox where the Railroad Commission says is a safe place to put the injectate, and then they can create their own cause of action and sue us for another $197 million.

14

**B. Standing and the evidence**

As noted above, Ageron has standing only if: (1) it holds assigned claims; or (2) the mineral interests it asserts were first injured after it acquired its leases in January 2020. *Emerald Oil*, 331 S.W.3d at 424. Again, Ageron holds no assigned claims.

In regard to whether the mineral interests at issue were first injured after January 2020, ETC points to evidence that (1) in October 2012, $H_2S$ was detected on the Dickinson Ranch in the Dickinson No. 2 oil and gas well, and (2) in November 2012, $H_2S$ escaped to the surface of the Dickinson Ranch and killed several cows. ETC argues that either event was sufficient to trigger accrual of all of the Dickinson Ranch owners' $H_2S$-related claims, including both surface and mineral estate claims. We consider each event in turn.[7]

**(1) $H_2S$ detected at the Dickinson No. 2 well**

In October 2012, $H_2S$ was detected on the Dickinson Ranch in the Dickinson No. 2 well, an inactive oil and gas well located 1,650 feet from ETC's disposal well. As Keith Crawford, ETC's predecessor's VP of Gas Supply and Business Development, explains:

> The Dickinson No. 2 Well was a plugged and abandoned well. In order to better understand the movement of the $H_2S$ and $CO_2$ injectate, the [TRC] asked [Regency] to drill through the plugs down to the Wilcox—approximately 6,000 feet true vertical depth . . . whereupon [Regency] encountered the injectate. [Regency] then commenced operations to re-plug the Dickinson No. 2 Well and completed re-plugging that well.

Because the Dickinson No. 2 well thus had already been plugged and abandoned when $H_2S$

---

[7] ETC cites additional evidence in support of its accrual argument, including: (a) Regency's 2013 $H_2S$ plume model, which was presented to the TRC and shared with the Dickinson Ranch's owners; (b) statements by R. Ross and John B. Dickinson that, through the 2013 TRC hearing, they became aware that $H_2S$ had migrated onto their property; (c) Regency's admission at a court hearing in 2014 that $H_2S$ was present under the Dickinson Ranch; and (d) the Dickinsons' disclosure in 2016 of a map with Regency's $H_2S$ plume model superimposed over their property, showing the plume migrating there as early as 2012. However, we find it unnecessary to address this evidence in light of our analysis below.

was detected, no ongoing drilling operation was infringed on or interfered with. As a result, in Ageron's view, no mineral-interest claim accrued because mere presence of $H_2S$ in a subsurface space does not infringe on or interfere with a mineral lessee's non-possessory interests. ETC does not disagree. Instead, ETC argues that mere presence of $H_2S$ in a subsurface space *does* infringe on a surface owner's possessory interest—here, Jeffrey Dickinson's interest, with negative ramifications for Ageron's claims. Before considering these alleged ramifications, however, we note that, as discussed above, *Regency* declined to decide the threshold issue of "whether subsurface migration can cause an actionable trespass to a surface owner's possessory interest in the subsurface space," citing three prior cases where the court had declined to decide the same issue. 622 S.W.3d at 816 n.18. And, as also discussed above, while ETC cites *XTO Energy* and *Myers-Woodward* as having held that a surface owner has a legally protected interest in his property's subsurface that would support a trespass claim, neither of these cases involved subsurface migration of contaminants or similar substances.[8] Thus, we again decline the invitation to venture into unsettled territory and instead next consider whether the remaining evidence might allow us to reach a decision based on settled law.

### (2) $H_2S$-related cow deaths

In November 2012, migrating $H_2S$ from Regency's disposal well escaped to the surface of the Dickinson Ranch and killed some of Jeffrey Dickinson's cows. Thus, any claims Jeffrey Dickinson may have had arising from this event would have accrued at that time. *Emerald Oil*, 331 S.W.3d at 424. Further, in ETC's view, under the legal-injury and single-action rules, it does

---

[8] *XTO Energy* involved an oil and gas well erected close to the property line whose wellbore crossed 126 feet into the subsurface of a neighboring tract at a depth of about 10,000 feet before turning and exiting at about 13,200 feet. 584 S.W.3d at 486. *Myers-Woodward* involved an underground cavern created by a salt-mining lessee that the lessee claimed to have the right to use for storage purposes. 2022 WL 2163857 at *10–11.

not matter whether other injuries suffered by Jeffrey Dickinson as a result of migrating $H_2S$ injected by Regency might then have been unknown, not yet experienced, or unattributed to their source; whether such migrating $H_2S$ might later cause additional injuries; or whether Jeffrey Dickinson had not yet sustained or could not yet ascertain any or all damages resulting from such migrating $H_2S$—any and all claims related to such injuries and damages accrued at the same time, i.e., no later than November 2012.

Ageron disagrees, arguing that because none of the Dickinsons had yet attempted to develop their minerals in 2012, any mineral-development interference or infringement claims they might have tried to bring back then would have been unripe. However, even assuming Ageron is correct that mineral-development claims accrue only after a drilling attempt fails—a matter we do not decide—the fact that a claim may be unripe will not stop it from accruing at the same time as a ripe claim based on an earlier injury caused by the same wrongful conduct. As *Regency* explains, "wrongful conduct may breach multiple legal duties [and] produce multiple legal injuries," but "under the single-action rule, [such] conduct gives rise to a single, indivisible action in which the claimant must pursue all claims for all damages resulting from all injuries that arise from the wrongful conduct, and those claims all accrue when the first such injury occurs." 622 S.W.3d at 815.

Thus, the death of Jeffrey Dickinson's cows resulted in accrual of not only his claims arising from this injurious event, but also any and all other claims he might have arising from the same allegedly wrongful conduct, including mineral-interest claims, ripe or not. Further, it is undisputed that ownership of the Dickinson Ranch mineral estate was undivided among its surface owners in 2012. As noted above, where property is jointly owned, all co-owners are necessary parties to a trespass or tort action for damages, both because "the law abhors a multiplicity of suits"

17

and because, "though the estates of the cotenants or joint owners are several, [] the damages survive to all; and it would be unreasonable to allow several actions for damages for one single trespass." *Catalon*, 166 S.W.2d at 105. Thus, because a trespass or tort committed against an undivided estate involves only a single, indivisible action for all co-owners, if Jeffrey Dickinson's present and future mineral-interest claims arising from Regency/ETC's $H_2S$ injection operation accrued no later than November 2012, so did the similar claims of all the other Dickinson Ranch owners, including Betty Dickinson, et al., from whom the tract on which Ageron's well sits was leased.

Ageron argues that "ETC's jurisdictional arguments all incorrectly assume Ageron's claims accrued prior to its leasehold acquisition," and, specifically, that the legal-injury and single-action rules "have no bearing here because those principles . . . only apply where the injury predates a claimant's acquisition of the property." But here a relevant injury to land *did* predate Ageron's acquisition of the property— $H_2S$ from Regency/ETC's disposal well killed Jeffrey Dickinson's cows—and accrual of claims arising from that injury triggered accrual of a chain of other claims, including the mineral-development claim Ageron seeks to assert in this case.

Further, while Ageron held "roughly a dozen" mineral leases in the area, Ageron does not argue that it has standing based on any leasehold other than the one on which its failed well is located.[9] Further, such an argument would be unavailing, as Ageron's claims relating to its other leases are all wholly dependent on and derivative of its claims relating to its failed-well lease. That

---

[9] In contrast, Ageron does argue that it prevails under the TCPA in part because "[T]he Dickinson Intervenors [in the case underlying *Regency*] complained about injury to only 53.3 acres . . .[whereas,] Ageron sued for harm to all 953 of its leasehold acres. Because the harmed acreage is far larger in this case, this litigation is not 'based on the same claims.'" However, we do not consider this argument because, as noted above, we decide this case without reaching the TCPA. For the same reason, we do not consider Ageron's argument that accrual of its claims would have been delayed by the discovery rule, which Ageron also raises only in the context of the TCPA. Moreover, as noted above, the discovery rule is inapplicable where a subsequent property owner lacks standing to sue for an injury to land that occurred prior to the passage of title.

is, Ageron pleaded that it was harmed in relation to its other leases only insofar as its failed well comprised the sole drilling operation perpetuating all of its leases, thus all of its leases expired when the well was abandoned. Dependent or derivative claims have no independent existence and cannot create standing. *See Brewerton v. Dalrymple*, 997 S.W.2d 212, 217 (Tex. 1999) (derivative claim automatically fails as matter of law when underlying claim fails); *Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 145 (Tex. 2019) (derivative claim accrues when underlying claim accrues, even if relevant events occur later). Further, under Ageron's own drilling-attempt accrual theory, no ripe claim ever developed for any leasehold other than the one on which it made its single failed drilling attempt.[10]

As a result, we conclude that Ageron lacks standing to bring any of its mineral-interest claims, thereby depriving the trial court of subject-matter jurisdiction.[11]

Finally, Ageron argues that, aside from its injury-to-land claims, it also has standing based on its duty-to-forewarn and duty-to-take-reasonable-measures claims. However, Ageron's argument regarding these claims is conclusory and cites neither supporting legal authority nor

---

[10] *Regency* assumed but did not decide that the single-action rule applies to separate injuries to separately titled properties. 622 S.W.3d at 817 ("Theoretically, at least, Swift could sustain each of [its] legal injuries to its interests in each of its nine leases at different times. For example, the migrating injectate could interfere with Swift's rights to explore and produce minerals under one of its leases before it interferes with those same rights under a different lease. We have not previously applied the single-action rule to claims involving separate injuries to separately titled real-property interests. But assuming the single-action rule applies to such claims, then—at least as our precedent has described it—the rule required Swift to bring all of its claims against Regency in one action . . . ."). The single-action rule thus may also preclude Ageron's other leases from creating standing.

[11] The dissent urges that Ageron has standing to bring a trespass action to its development rights, because, by very nature of the claim, no concrete and particularized injury can result before an attempt to develop occurs and no development attempt occurred prior to Ageron's. Though that may be true, we come to our conclusion by applying the well-established legal-injury and single-action rules, as discussed above. While an exception to the single-action rule for interference with development rights may be tenable, such an exception does not currently exist, and we maintain, just as the Fourth Court of Appeals did when considering an asbestos-related mesothelioma exception to the single-action rule, "any decision to do so here should be by [the Texas Supreme Court]." *Pustejovsky v. Rapid-Am. Corp.*, 35 S.W.3d 643, 645 (Tex. 2000) (quoting *Pustejovsky v. Pittsburgh Corning Corp.*, 980 S.W.2d 828, 831–33 (Tex. App.—San Antonio 1998), *reversed and remanded* by *Pustejovsky*, 35 S.W.3d 643).

supporting evidence.[12] The Texas Rules of Appellate Procedure provide that a brief on appeal must contain a clear and concise argument, including appropriate citations to authority and to the record. *See* TEX. R. APP. P. 38.1(i), 38.2(a)(1). "This requirement is not satisfied by merely uttering brief conclusory statements unsupported by legal citations." *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.) (citing *Sweed v. City of El Paso*, 195 S.W.3d 784, 786 (Tex. App.—El Paso 2006, no pet.)); *see also In re A.N.G.*, 631 S.W.3d 471, 476-77 (Tex. App.—El Paso 2021, no pet.) (explaining that issues "may be waived when [a party] fails to provide citations, argument, or analysis" and the Court is "not required to perform research nor develop an argument for [a party]"); *Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 896 (Tex. App.—Dallas 2010, no pet.) ("And, just as importantly, existing legal authority applicable to the facts and the questions we are called on to answer must be accurately cited. . . . If we are

---

[12] On appeal, Ageron addresses these claims in three sentences which contain only a single citation, and that citation merely refers to Ageron's pleading, which is likewise conclusory:

> However, even if ETC prevails on the accrual issue (which ETC cannot), in *that* purely hypothetical scenario Ageron's standing is still sound. Even setting aside Ageron's standing to assert property-damage claims, ETC breached other duties owed directly to surrounding lessees—most notably, ETC's duties to (1) forewarn Ageron about the presence and extraordinarily high concentration of acidic $H_2S$ in the Wilcox formation and (2) take reasonable measures to prevent or at least lessen the toxic plume's interference with Ageron's drilling. CR.610 ¶ 37. ETC breached those duties owed to Ageron in 2021 and 2022 when ETC, despite knowing Ageron's wellbore would pierce the Wilcox formation, sat idle and in silence. (emphasis in original).

In the trial court, Ageron's response to ETC's motion to dismiss discussed its failure-to-warn and failure-to-act claims, but similarly lacked supporting authority. The only case Ageron cited in support of either claim—*Union Pac. R.R. Co. v. Chenier*, 649 S.W.3d 440 (Tex. App.—Houston [1st Dist.] 2022, pet. denied)— addressed neither the cognizability of such claims nor their potential scope or contours, if such claims exist in that context. *Id*. at 442. Instead, *Chenier* is a TCPA case which merely held that the matters pleaded were not "based on" or "in response to" TCPA-protected communications. *Id*. at 447–48. Further, as noted above, ETC did send a letter warning Ageron that it was about to drill through ETC's $H_2S$ injection zone, which Ageron already knew existed and posed a significant danger to its equipment and personnel, as reflected in its drilling permit application, drilling fluid program, and 40-page $H_2S$ contingency plan. *See generally Austin v. Kroger Texas, L.P.*, 465 S.W.3d 193, 204 (Tex. 2015) (no need to warn against known danger); *Hicks v. Humble Oil & Refin. Co.*, 970 S.W.2d 90, 94 (Tex. App.—Houston [14th Dist.] 1998, pet. denied) (because plaintiffs had actual notice of dangerous condition, defendant owed no legal duty to disclose it); *see also generally Norman v. Henkel*, 407 S.W.3d 502, 505 (Tex. App.—Houston [14th Dist.] 2013), *rev'd on other grounds*, 441 S.W.3d 249 (Tex. 2014) (warning, if required, need not include instructions regarding how to avoid dangerous condition).

not provided with existing legal authority that can be applied to the facts of the case, the brief fails."). Accordingly, we conclude that Ageron waived any argument that it has standing under its failure-to-warn or failure-to-take-reasonable-measures claims.

## CONCLUSION

We reverse the trial court's order denying ETC's motion to dismiss for lack of subject-matter jurisdiction, vacate the trial court's order denying ETC's motion to dismiss under the TCPA, and render judgment dismissing this case for lack of subject-matter jurisdiction.


LISA J. SOTO, Justice

December 29, 2023

Before Palafox and Soto, JJ., and Marion, C.J. (Ret.)
Marion, C.J. (Ret.), sitting by assignment
Palafox, J., dissenting